UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GT SECURITIES, INC.,

  Plaintiff,

v.

KLASTECH GMBH, et al.,

  Defendants.

Case No.  C-13-03090 JCS

**ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS FOR LACK OF PERSONAL AND SUBJECT MATTER JURISDICTION**

**Dkt. Nos. 58, 59**

## I.      INTRODUCTION

Plaintiff GT Securities, Inc. ("GTK") brings an action for breach of contract against Defendant Klastech GmbH ("Klastech") and an action for interference with contract against Defendant Triangle Venture Capital Group GmbH & Co. KG Nr. IV ("Triangle").  Klastech and Triangle each bring a Motion to Dismiss ("Klastech Motion" and "Triangle Motion," respectively) for lack of personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure.  In addition, Klastech argues that Plaintiff's claims are subject to arbitration based on the theory of equitable estoppel and therefore subject to dismissal under either 12(b)(1), (3), or (6).  The Court held a hearing on the Motion on Friday, June 27, 2014, at 9:30 a.m.  For the reasons state below, both Motions are DENIED.[1]

## II.     BACKGROUND

### A.  Procedural Background

Plaintiff filed its Complaint in this action on July 3, 2013.  On April 15, 2014, both Klastech and Triangle filed Motions to Dismiss for lack of personal jurisdiction pursuant to Rule

---

[1] The parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

12(b)(2) of the Federal Rules of Civil Procedure.  GTK filed a combined Opposition to Defendants' Motions on April 29, 2014.  Triangle replied to GTK's Opposition on May 6, 2014. Klastech did not file a Reply to GTK's Opposition to its Motion.  On May 28, 2014, Klastech filed a notice stating that for financial reasons, it would not be filing a Reply brief.

### 1.   The Complaint

GTK alleges that Triangle principals, Bernd Geiger and Wiebke Langhans,[2] negotiated a letter agreement dated July 31, 2010 ("Agreement"), on behalf of Klastech,[3] engaging GTK to provide advisory and investment banking services with respect to the exploration of strategic alternatives for Klastech, including a sale or merger ("Transaction").  Compl. ¶ 8-9 & Exhibit ("Ex.") A (Agreement).  GTK alleges that a Transaction, in the form of the sale of Klastech to Power Technology, Inc. ("PTI") took place on January 21, 2013 and that, therefore, pursuant to the Agreement, Klastech owed GTK the "Success Fee" as well as public recognition of its role in providing services that led to the Transaction.  Compl. ¶ 18-19.

GTK alleges that, in breach of their contract, Klastech refused to pay GTK.  *Id*. at 19. GTK further alleges that it is informed and believes that Triangle falsely represented to PTI that Klastech had no obligations to any investment bank or other entity in connection with the Transaction, and/or wrongfully failed to disclose the Agreement, with the intent to induce Klastech to breach the Agreement and to deprive GTK of the payments and other benefits due it under the Agreement.  Compl. ¶ 27.  GTK asserts that Triangle did so fraudulently, maliciously, and in willful and conscious disregard for the rights of GTK under the Agreement.  Compl. ¶ 30.

Against Klastech and Triangle, GTK seeks compensatory damages in an amount to be proven at trial, but in no event less than $400,000, plus pre and post judgment interest, attorneys' fees, and reasonable costs and expenses as provided by law and in the Agreement.  Compl. ¶ 24. Additionally, against Triangle, for its willful and malicious conduct, GTK seeks punitive damages. Compl. ¶ 30.

---

[2] Wiebke Langhans is alternatively referred to as Wiebke Langham in the parties' documents.  The Court has chosen to use "Langhans" for consistency.

[3] At the time Klastech was wholly owned by Triangle.  PTI now owns Klastech.  Compl. ¶ 4.

United States District Court
Northern District of California

### 2. Klastech Motion

Klastech argues that, pursuant to California's long-arm jurisdictional statute and federal due process requirements, it should be dismissed from this breach of contract action because the Complaint fails to allege facts establishing either general or specific jurisdiction over it. Klastech Motion at 2 (citing *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006)).

Klastech contends that, because its activities in California are not "substantial, continuous and systematic" and it is not domiciled in California, it is not subject to this Court's general jurisdiction. Klastech Motion at 3 (citing *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998)). With regards to specific jurisdiction, Klastech asserts that its single contract with a resident of California, GTK, is not sufficient on its own to establish that it purposefully availed itself of the benefits of doing business in California. Klastech Motion at 4 (citing *Thomas P. Gonzalez Corp. v. Consejo Nacional De Produccion De Costa Rica*, 614 F.2d 1247, 1253 (9th Cir. 1980); *Azzarello v. Navagility, LLC*, 2008 WL 4614667, at 3 (N.D. Cal. Oct. 16, 2008)).

In addition, Klastech moves to dismiss GTK's claim against it under Rules 12(b)(1), (3), and (6)[4] of the Federal Rules of Civil Procedure on the grounds that GTK's claim is subject to arbitration pursuant to the agreement for the purchase of Klastech by PTI ("Purchase Agreement"). Klastech Motion at 8. According to Klastech, because Plaintiff's Complaint alleges Plaintiff is entitled to payment based upon the Purchase Agreement, and in an amount to be determined by examining the Purchase Agreement, the Purchase Agreement's arbitration clause governs. Klastech Motion at 8-9; Declaration of William Burgess ("Burgess Decl."), Ex. A ("Purchase Agreement").

### 3. Triangle Motion

Triangle asks the Court to dismiss the claim against it under Rule 12(b)(2) of the Federal Rules of Civil Procedure because it asserts that it does not have sufficient contacts with California to allow this Court to establish personal jurisdiction over it. Triangle Motion at 1 (citing *Rocke v.*

---

[4] Klastech does not specify which Federal Rule of Civil Procedure is appropriate for its arbitration claim, noting that courts differ. In the Ninth Circuit, motions to dismiss based on arbitration fall under Rule 12(b)(1) of the Federal Rules of Civil Procedure.

*Can. Auto. Sport Club*, 660 F.2d 395, 398 (9th Cir. 1981)).  Triangle argues that it has not engaged in the type of "substantial, continuous and systematic" activity necessary for California to assert general jurisdiction over it because it has no offices, employees, directors, managers, or property in California.  Triangle Motion at 7; Declaration of Bernd Geiger ("Geiger Decl.") ¶¶ 4-7.  Triangle also argues that, as a non-party to the Agreement, it has not purposefully directed any of its activities at California residents or availed itself of the privilege of conducting activities in California and thus is not subject to the Court's specific jurisdiction.  Triangle Motion at 7; Geiger Decl. ¶¶ 5, 13.

### 4.  GTK Opposition

In its Opposition, GTK asserts that is claims against both Defendants are based on a long and involved relationship in California and that, therefore, the exercise of specific personal jurisdiction is proper as to both Defendants.  Plaintiff's Opposition to Defendant's Motion to Dismiss ("Opp.") at 1.  GTK also contends that Klastech is subject to general jurisdiction due its continued sales presence in California and the attendance of its personnel at an annual trade show in California.  *Id*.  GTK asks the Court to allow it to conduct jurisdictional discovery, if necessary.  *Id*.  Finally, GTK argues that Klastech's motion to compel arbitration should be denied because GTK has never agreed to arbitrate any dispute with Klastech.  *See id*. at 13-14; Declaration of Ali Tabibian ("Tabibian Decl.") ¶ 15.

### 5.  Triangle Reply

Triangle's primary argument against personal jurisdiction in its Reply brief is that Geiger and Langhans were acting as Beiratsmitglieder (German for "directors" or "members of the board") for Klastech until its acquisition by PTI, and therefore the actions that occurred during the relevant contract formation negotiations were done at the direction and for the benefit of Klastech, not Triangle.  Triangle's Reply to Plaintiff's Opposition to Triangle Motion to Dismiss ("Reply") at 2; Geiger Decl. ¶ 3.  Triangle asserts that, pursuant to German law, as members of Klastech's board Langhans and Geiger had a "duty of loyalty" to Klastech.  Reply at 3.  Accordingly, Triangle contends that, as an entity in and of itself, it was not involved in the formation of the contract between GTK and Klastech nor in any of the actions undertaken by Langhans and Geiger

United States District Court
Northern District of California

"during the time PTI purchased Klastech." *Id*.; Geiger Decl. ¶¶ 2, 3, 7.

### 6.   Factual Background

GTK is a California corporation with its principal place of business in Los Angeles County, California.  Compl. ¶ 5.  Triangle and Klastech are German corporations with their headquarters in Germany.  *See* Geiger Decl. ¶ 4; Burgess Decl. ¶ 4.  Klastech asserts that it has no operations, offices, or employees in the United States or California.  Klastech Motion at 4.  However, GTK argues that Klastech used an independent contractor to sell its products in California prior to its acquisition and that, since its acquisition, its website lists a designated sales representative for the "USA West" with two California phone numbers.  Opp. at 14 (citing Klastech Motion at 4); Declaration of Geoffrey C. Rushing ("Rushing Decl.") ¶ 2 & Exs. 1-2.  Triangle has no offices, employees, directors, managers, agent for service, sales, marketing, or property in California.  Geiger Decl. ¶¶ 3-8, 10.  According to GTK, during the actions that gave rise to this Complaint, Klastech was a wholly owned subsidiary of Triangle.  Compl. ¶ 4.  As of January 21, 2013, Klastech has been acquired by PTI, an Arkansas-based corporation.  Comp. ¶ 18; Rushing Decl., Ex. 3.

In September, 2009, Langhans, a principal at Triangle, emailed GTK to inquire about the possibility of engaging its investment management services for Klastech in the exploration of strategic alternatives, including a Transaction.  Tabibian Decl., Ex. 1.  Langhans sent this email from her @triangle-venture.com email account, with a signature block that identified her as an Investment Manager at Triangle Venture Capital Group Management GmbH, to Tabibian at GTK.  It states:

> I received information that you are an expert in transactions in the photonics industries and that you supported the SpectraPhysics - Newport deal in the past.
>
> Triangle has invested in 2006 into a German start-up called KLASTECH which develops and commercializes a new generation of DPSS lasers.  We would like to identify potential M&A possibilities and shape the company's future strategy to make i[t] attractive for an exit.  Potentially especially the company's patented technology is interesting for its competitors.
>
> I would be happy to set up a conference call with my colleague Dr.

5

United States District Court
Northern District of California

Geiger to exchange some information about Triangle and Klastech and would like to ask if you are available for a call on Friday.

Tabibian Decl., Ex. 1.

Langhans and Geiger, another Triangle principal, negotiated the Agreement between GTK and Klastech with the help of sophisticated counsel from Foley & Lardner.  Tabibian Decl. ¶ 6.  The negotiations were conducted through telephone discussions and email exchanges, including one dated June 2010.  Tabibian Decl. ¶ 6 & Ex. 5.  In this email exchange, Sven Riethmueller from Foley & Lardner writes that he is "awaiting feedback on one issue f[r]om Triangle" after "sending the revised proposed draft based on our conversation of Friday this morning California time."  Tabibian Decl., Ex. 5.  Langhans, from her @triangle-venture.com email address was part of the email conversation and participated in planning a phone call.  *Id.*

GTK's contractual relationship with Klastech began on July 31, 2010, pursuant to the Agreement negotiated by Triangle.  Tabibian Decl. ¶ 1; Compl., Ex. A.  In the Agreement, GTK agreed to share at least bi-weekly written reports of its progress via Tabibian, the individual with "principal senior responsibility for the day to day management."  Compl., Ex. A, Section 1.  In return for GTK's services under the Agreement, Klastech promised to make three retainer payments of $10,000 each due in July, August, and September of 2010 and to cover GTK's out-of-pocket expenses.  *Id.*, Sections 2(a) and 3.  In the event of the consummation of a Transaction during GTK's engagement and prior to termination of the Agreement, the Agreement specifies that Klastech pays a minimum "Success Fee" of $400,000, plus an additional amount to be determined based on the ultimate value of the Transaction.  *Id.*, Section 2(b)(1).  Klastech must mention GTK's role as advisor in any press release or public announcement it makes about the Transaction.  *Id.*, Section 6.  Klastech is allowed to terminate at any time by giving seven days prior written notice to GTK.  *Id.*, Section 4.  In addition, Klastech has no obligation to agree to any other employee of GTK to serve as a suitable replacement of Mr. Tabibian.  *Id.*  Under certain circumstances, GTK is still eligible for the "Success Fee" for Transactions consummated after Klastech's termination.  *Id.*  The Agreement is governed by New York law.  *Id.*, Section 8.

As contemplated by the Agreement, in August and September 2010, Klastech, Triangle, and GTK exchanged information, developed an Executive Summary presentation for potential

United States District Court
Northern District of California

1    acquirors, and communicated several times a week, sometimes daily.  Tabibian Decl. ¶ 7.  In July,

2    August, and September 2010, Klastech made three monthly retainer payments by wire to GTK's

3    California bank account.  *Id*.  Between September and December 2010, Tabibian contacted

4    approximately twenty potential acquirors on behalf of GTK, several of which were located in

5    California.  *Id*. ¶ 8.

6        When Tabibian left GTK to work at Citigroup in December 2010, GTK offered Klastech

7    the option to transfer the Agreement to Citigroup or to terminate it.  Tabibian Decl. ¶ 10 &

8    Compl., Ex. B.  Tabibian informed Triangle of his departure as well and explained to Geiger over

9    the phone that the option to terminate allowed Klastech to keep the engagement open and re-start

10   at GTK without the need for payment of a new retainer.  Tabibian Decl. ¶ 10.  When Tabibian

11   returned to GTK in January 2012 after two years at Citigroup, Klastech executed a subsequent

12   written agreement for additional services.  Tabibian Decl. ¶ 11 & Ex. 4.

13       From January 2012 through July 2012, GTK continued to provide advice, identify

14   potential acquirors, develop approach strategies, and exchange periodic updates with Klastech and

15   Triangle.  Tabibian Decl. ¶ 12.  Tabibian met with the CEO of Klastech, Chris Madin, and a

16   Klastech sales representative in San Francisco to discuss the status of their work, while the two

17   were attending a trade show in California.  *Id*.  Tabibian also provided advice to Klastech and

18   Triangle on their interactions with PTI.  *Id*. ¶ 13.  In an email exchange that took place on July 2,

19   2012, Langhans, again from her @triangle-venture.com email account, emailed Tabibian

20   regarding "a response from PTI" and expressed a desire to schedule a meeting.  Tabibian Decl.,

21   Ex. 3.  The email exchange also included Madin at his @klastech.de email account.  *Id*.

22       On January 28, 2013, Tabibian contacted Madin to suggest a meeting in San Francisco, at

23   which point, Madin informed Tabibian that as of January 21, 2013, Klastech had been acquired by

24   PTI pursuant to the Purchase Agreement signed by Klastech, Triangle, and PTI.  Comp. ¶ 18;

25   Burgess Decl., Ex. A (Purchase Agreement).  GTK alleges that Klastech is now wholly owned by

26   and run in close coordination with Arkansas-based PTI.  Opp. at 11 (citing Compl. ¶ 4).  GTK

27   refers the Court to a 2014 press release, entitled "Power Technology Inc. Acquires Advanced

28   DPSS Laser Manufacturer KLASTECH GmbH."  Rushing Decl., Ex. 3.  The press release states,

in part:

> "Power Technology will retain the KLASTECH organization in its
> entirety, and will be working over the next several months to
> seamlessly integrate both products and employees into the Power
> Technology organization.  Production and sales of KLASTECH
> laser line will continue in KLASTECH's German location in
> Dortmund."

*Id.*

In accordance with the Agreement, GTK demanded payment of the "Success Fee" from Klastech based upon the Transaction with PTI, which Klastech allegedly refused to pay.  Compl. ¶ 19.  GTK alleges that Triangle falsely represented to PTI that Klastech had no obligations to any investment bank or other entity in connection with the Transaction, pointing to the "no broker" provision of the Purchase Agreement, which reads as follows:

> 2.3  <u>Broker's Fees.</u>  Neither Sellers [Triangle and others] nor Company
> [Klastech] has liability or any obligation to pay any fees or commissions
> to any broker, finder, or agent with respect to the transactions
> contemplated by this Agreement for which Buyer [PTI] or Company
> could become liable or obligated.  Any fees due to brokers engaged by
> Sellers, or Sellers' consultants and advisors shall be paid by Sellers.

Compl. ¶ 27; Burgess Decl., Ex. A.  The Purchase Agreement also contains a clause which provides for arbitration in New York and which Klastech references in its Motion to Dismiss for lack of subject matter jurisdiction.  *See* Burgess Decl., Ex. A, Section 8.11.

## III.   ANALYSIS

### A.  Personal Jurisdiction

#### a.   <u>Legal Standard</u>

##### 1.  *Rule 12(b)(2)*

A party may move for dismissal under Rule 12(b)(2) of the Federal Rules of Civil Procedure for lack of personal jurisdiction.  The plaintiff bears the burden of establishing personal jurisdiction over the defendant.  *See Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006).  "Where, as here, the motion is based on written materials rather than an evidentiary hearing, 'the plaintiff need only make a prima facie showing of jurisdictional facts.'"  *Id.* (quoting

United States District Court
Northern District of California

*Sher v. Johnson*, 911 F.3d 1357, 1361 (9th Cir. 1990)).  "Although the plaintiff cannot simply rest

on the bare allegations of its complaint, … uncontroverted allegations in the complaint must be

taken as true." *Schwarzenegger*, 374 F.3d at 800 (internal quotations omitted).  "Conflicts

between parties over statements contained in affidavits must be resolved in the plaintiff's favor."

*Id*.  "Where, as here, there is no applicable federal statute governing personal jurisdiction, the

district court applies the law of the state in which the district court sits." *Dole Food Company,

Inc. v. Watts*, 303 F.3d 1104, 1110 (9th Cir. 2002).  "Because California's long-arm jurisdictional

statute is coextensive with federal due process requirements, the jurisdictional analyses under state

law and federal due process are the same." *Id*. (citing Cal. Code Civ. Proc. § 410.10).

### 2. *Standard Governing Exercise of Personal Jurisdiction*

"For a court to exercise personal jurisdiction over a non-resident defendant, that defendant

must have at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction

'does not offend traditional notions of fair play and substantial justice.'" *Dole Food*, 303 F.3d at

1110-11 (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  "In judging

minimum contacts, a court properly focuses on 'the relationship among the defendant, the forum,

and the litigation.'" *Calder v. Jones*, 465 U.S. 781, 788 (1984) (quoting *Shaffer v. Heitner*, 433

U.S. 186, 204 (1977)).

Personal jurisdiction may be either general or specific.  *See Bancroft & Masters, Inc. v.

Augusta Nat. Inc*., 223 F.3d 1082, 1086 (9th Cir. 2000).  General jurisdiction may be established

when a defendant's contacts with a state are "substantial" or "continuous and systematic" such that

the defendant "can be haled into court in that state in any action, even if the action is unrelated to

those contacts." *Id*.  "The standard for establishing general jurisdiction is fairly high, and requires

that the defendant's contacts be of the sort that approximate physical presence." *Id*.  "Factors to be

taken into consideration are whether the defendant makes sales, solicits or engages in business in

the state, serves the state's markets, designates an agent for service of process, holds a license, or is

incorporated there." *Id*.  "[E]ngaging in commerce with the residents of the forum state is not in

and of itself the kind of activity that approximates physical presence within the state's border." *Id*.

Nevertheless, "[e]ven if a defendant has not had continuous and systematic contacts with

United States District Court
Northern District of California

the state sufficient to confer general jurisdiction, a court may exercise specific jurisdiction when the following requirements are met:

> (1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privileges of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Dole Food*, 303 F.3d at 1111 (internal quotations and citations omitted).  "The plaintiff bears the burden of satisfying the first two prongs of the test."  *Id*. (citing *Sher*, 911 F.2d at 1361).  If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state."  *Dole Food*, 303 F.3d at 1111.  "If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable."  *Id*. (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-78 (1985)).

"Once it has been established that a defendant purposefully established minimum contacts with a forum, 'he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable' in order to defeat personal jurisdiction."  *Dole Food*, 303 F.3d at 1144 (quoting *Burger King*, 471 U.S. at 477).  To determine whether the exercise of jurisdiction is reasonable, and therefore, "comports with fair play and substantial justice," courts consider seven factors:

> (1) the extent of the defendants' purposeful injection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

1    *Dole Food*, 303 F.3d at 1114.

2         In *Dole Food*, the Ninth Circuit held that California's exercise of specific, personal

3    jurisdiction over two foreign individuals who allegedly defrauded a California corporation was

4    reasonable.  *Dole Food*, 303 F.3d at 1106.  Plaintiff Dole U.S., a corporation incorporated with its

5    principal place of business in California, sued two former employees, Watts (a citizen of the U.K.)

6    and Boenneken (a citizen of Germany), for fraudulently inducing Dole to lease warehouse space in

7    the Netherlands on unfavorable terms.  *Id*. at 1107.  Both employees worked at Dole's European

8    offices, although Watts's direct supervisor worked in Dole's California office.  *Id*. at 1107.  Dole

9    alleged that Watts pitched the plan that led to Dole's unfavorable lease during a visit to the

10   California office and that both employees communicated frequently with Dole's California office

11   by phone, fax, and mail regarding implementation of the plan.  *Id*.

12        In weighing the seven reasonableness factors, the court emphasized the "heavy burden on

13   both domestic and foreign defendants in proving a 'compelling case' of unreasonableness to defeat

14   jurisdiction."  *Id*. at 1117 (citing *Roth v. Garcia Marquez*, 942 F.2d 617 (9th Cir. 1991) (finding

15   personal jurisdiction in California over two foreign individual defendants, despite the fact that

16   only two of the reasonableness factors favored plaintiff while three factors favored the defendants,

17   who "ma[d]e a strong argument . . . that the exercise of jurisdiction may be unreasonable.")  The

18   court noted that the only two factors that favored defendants - burden on defendants and

19   sovereignty conflicts - "are likely to favor foreign defendants every time personal jurisdiction in

20   the United States is considered."  *Id*.  Finally, the court found that Watts and Boenneken had

21   several U.S.-based relationships, including employment relationships, and the intended audience

22   for defendants' communications was the plaintiff, headquartered in California.  *Id*.  Therefore, the

23   court concluded that the balance of the factors established that jurisdiction in California was

24   reasonable.  *Id*.

25        The different outcomes on the exercise of specific jurisdiction in *Dole Food* and *Core-Vent*

26   provide a useful contrast for assessing the weight of various facts in a determination of

27   reasonableness.  In *Core-Vent*, the Ninth Circuit held that California's exercise of specific,

28   personal jurisdiction over four doctors in Sweden who allegedly defamed a California corporation

United States District Court
Northern District of California

11

in articles published in international medical journals would not comport with fair play and substantial justice. *Core-Vent Corp*., 11 F.3d at 1483. Plaintiff Core-Vent, a California corporation that manufactured dental implants, sued four Swedish doctors based on two articles they had published in two journals, both distributed world-wide, that "contained false and misleading comparisons of Core-Vent and Nobelpharma," allegedly at the direction of Nobelpharma, Core-Vent's competitor. *Id*. at 1483-84. Core-Vent also sued Nobelpharma, three individual Americans, and another Swedish citizen, but these defendants were not parties to this appeal of personal jurisdiction. *Id*. at 1484.

Based on the seven factors, the court found that the Swedish doctors had presented a compelling case that the exercise of personal jurisdiction was unreasonable. *Id*. In reaching this decision, the court put particular emphasis on the defendants' status as individual citizens of a foreign country, noting that "[t]he Supreme Court in *Asahi* indicated that a plaintiff seeking to hale a foreign citizen before a court in the United States must meet a higher jurisdictional threshold than is required when the defendant is a United States citizen." *Id*. It explained that "where the plaintiff [was] an international corporation and where the defendants [were] individual citizens of a foreign country who lack[ed] connections to the United States and whose purposeful interjection into the forum state [was] very limited," the interest of a state in providing a forum for those injured in its borders "must give way." *Id*. The Court found that the defendants' purposeful interjection was limited because California was not the primary audience for the journals, and, in fact, the defendants had no knowledge the journals would be distributed there. *Id*. at 1486. The court also emphasized that the plaintiff's ability to obtain effective relief was not compromised by dismissal of the Swiss doctors because the court maintained jurisdiction over the remaining defendants. *Id*. at 1490.

### b. Klastech is Subject to Personal Jurisdiction

While GTK contends that Klastech is subject to both specific and general jurisdiction in California, because the Court finds that there are sufficient contacts with the forum related to the claim to support its exercise of specific jurisdiction, the Court need not decide the question of

general jurisdiction over Klastech.[5]

### 1.  Specific Jurisdiction

#### a.  Purposeful Availment

"The purposeful availment requirement ensures that a nonresident defendant will not be haled into court based upon "random, fortuitous or attenuated contacts with the forum state." *Panavision Intern., L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998) (quoting *Burger King*, 471 U.S at 475).  While a single contract with a resident of the relevant jurisdiction is not necessarily sufficient, the critical issue is whether the contract evidences a substantial relationship with the forum based on prior negotiations, contemplated future consequences, and the terms of the contract.  *See Burger King*, 471 U.S. at 475-76.  "[W]ith respect to interstate contractual obligations, . . . parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanction in the other State for the consequences of their activities."  *Id.* at 473.

---

[5] Although Klastech may have sufficient contacts with California to support specific jurisdiction, it is not clear whether Klastech's contacts meet the standard of substantiality required for general jurisdiction.  Ninth Circuit precedent on general jurisdiction requires courts to "focus upon the 'economic reality' of the defendants' activities rather than a mechanical check list."  *See Gates Learjet Corp. v. Jensen*, 743 F.2d 1325 (9th Cir. 1984).  While GTK alleges that Klastech has had a sales presence in California through an independent contractor in the past and, currently, through a designated PTI employee for the "USA West," the record does not contain sufficient evidence on the extent of Klastech's sales activities in California for the Court to make an informed determination on whether such activity approximates "physical presence."  Furthermore, the Court would need to determine whether Klastech's use of an independent contractor as a sales representative affects its analysis.  The parties disagree on this issue but provide no case law in support of their assertions.  Ninth Circuit jurisprudence is ambiguous.  *See Ochoa v. J. B. Martin and Sons Farm, Inc.*, 287 F.3d 1182, 1190 (9th Cir. 2002) (holding that an independent contractor who is not an employee of a principal can nevertheless still be the principal's agent, but it depends on the extent of control the principal exercises over the agent); *cf. Eftekhari v. Peregrine Financials & Securities, Inc.,* No. C 00-3594, 2001 WL 1180640, at 5 (N.D. Cal. Sep. 24, 2001) (holding that defendant *might* have had "continuous and systematic" contacts with the forum if plaintiff had continued to work as an independent contractor for defendant in that forum); *Reid-Ashman Mfg., Inc. v. Swanson Semiconductor Service, LLC*, No. C-06-4693, 2006 WL 3290416, at 5 (N.D. Cal. Nov. 13, 2006) (holding that defendant's suggestion that an independent contractor does not provide a basis for personal jurisdiction is not supported by any authority that distinguishes employees and independent contractors with regards to whether a defendant has directed his activities towards the forum).  The parties have not provided evidence on the nature of the relationship between Klastech and its independent contractor.

United States District Court
Northern District of California

In *Burger King*, despite the defendant's never having been to Florida, his contract with Florida-based plaintiff, Burger King, to establish a franchise in Michigan demonstrated a substantial connection with Florida where defendant "'reach[ed] out beyond' Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization." *Burger King*, 471 U.S. at 480. The Supreme Court rejected the lower court's determination that, in light of the supervision emanating from Burger King's district office in Michigan, defendant believed that office was the embodiment of Burger King and he had no reason to anticipate a suit outside of Michigan. *Id.* Instead, the Supreme Court pointed to evidence that defendant knew he was "affiliating himself with an enterprise based primarily in Florida" in the form of 1) the contract documents specifying that Burger King operated in Florida and that the agreement was made and enforced there and 2) the parties' course of dealing in which the defendant corresponded with Florida headquarters by mail and phone. *Id.* at 481.

GTK has provided sufficient factual allegations and non-conclusory testimony to establish that Klastech's conduct pursuant to the Agreement gives rise to a "substantial connection" with California by creating "'continuing obligations' between [itself] and [a] resident[] of the forum." *See Burger King*, 471 U.S. at 475-76. First, just like the defendant in *Burger King*, Klastech "reached out" to a California corporation to enter into a long-term relationship from which Klastech derived manifold benefits in the form of hundreds of hours of work performed by GTK in California. Compl. ¶¶ 8, 9, 15, 16, 17. Pursuant to the Agreement, GTK prepared evaluation materials for a potential Transaction, introduced Klastech to potential acquirors (many of them in California), participated in discussions with potential acquirors, and provided advice to Klastech on its interactions with PTI. Compl. ¶ 15, 17.

Second, although Klastech claims it believes GTK performed work for it in Germany, there is sufficient evidence to demonstrate that Klastech knew it was "affiliating [itself] with an enterprise based primarily in [California]." *See Burger King*, 471 U.S. at 481. First, the contract documents demonstrate Klastech's affiliation with California, albeit less strongly than in *Burger*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

14

*King* by listing GTK's San Francisco address on every page.[6]  Compl., Ex. A (Agreement). Second, the parties' course of dealing provides evidence that Klastech knew it was establishing a long-term relationship that contemplated continuous contact with California.  During negotiations, Langhans met with GTK in San Francisco to discuss the business and sales prospects for Klastech. Tabibian Decl. ¶ 4.  Pursuant to the Agreement, Klastech communicated with GTK regularly (several times a week) via telephone and email, just as the parties in *Burger King* did.  Tabibian Decl. ¶ 7.  Finally, Madin, CEO of Klastech, came to San Francisco to meet with GTK and discuss the status of the work under the Agreement.  Tabibian Decl. ¶ 12.

Thus, Plaintiff has demonstrated that Klastech knew it was affiliating itself with a California corporation in a manner that would lead to substantial contacts with California.  The Court finds that GTK has made a prima facie showing that Klastech purposefully availed itself of the "privileges of conducting activities in the forum, thereby invoking the benefits and protections of its laws."  *See Dole Food*, 303 F.3d at 1111 (internal quotations and citations omitted).

b.   Relatedness of Claim

"The second requirement for specific, personal jurisdiction is that the claim asserted in the litigation arises out of the defendant's forum related activities."  *Panavision*, 141 F.3d at 1322. The Court must determine if Plaintiff would not have been injured "but for" Defendant's contacts with California.  *See id.*  In *Panavision*, the defendant's registration of plaintiff's trademarks as his own domain names had the effect of injuring a plaintiff in California.  *Id.*  Therefore, the court concluded that "but for" the defendant's conduct, the plaintiff's injury would not have occurred. *Id.*  Similarly, in *Burger King*, the defendant's refusal to make contractually required payments in the forum state, and his continued use of Burger King's trademarks, "caused foreseeable injuries to the corporation in Florida," such that plaintiff's claim arose out of the defendant's forum-related activities.  *Burger King*, 471 U.S. at 480.

---

[6] GTK argues that by agreeing to comply with the "applicable state 'blue sky' and applicable securities laws of other jurisdictions," Klastech agreed to comply with California law.  *See* Compl., Ex A., Section 11.  However, there is no indication that the parties intended this provision to be anything other than a general promise to abide by any relevant laws of any state that might apply in the event of a Transaction.

United States District Court
Northern District of California

Here, Klastech's refusal to make contractually required payments in California, and to give GTK the contractually required recognition due in California, has caused foreseeable injuries to GTK in California. *See* Compl. ¶¶ 23-24. "But for" Klastech's engagement of GTK to perform services in California and its failure to make contractually required payments in California, GTK would not have suffered financial harm in California. Compl. ¶¶ 8, 11. The Court finds that GTK has demonstrated that its claim against Klastech arises out of Klastech's California-related activities.

### c.   Reasonableness

Next, the Court examines the seven reasonableness factors in turn. First, the Court considers the extent of Klastech's purposeful injection into the forum state. The Court finds that the activities which demonstrate that Klastech purposefully availed itself of the privilege of doing business in California are also sufficient in this case to meet the purposeful injection test. Just as in *Dole Food*, where the defendants' purposeful injection favored jurisdiction, Klastech engaged in repeated communications with GTK manager, Tabibian, in California in furtherance of their contractual relationship, including travelling to California to discuss business with GTK on at least one occasion. *See id.* at 1115. Klastech knew GTK had its principal place of business in California and it knew it was affiliating itself with GTK in a manner that would result in substantial contacts with California.[7] *See id.*

With respect to factor two, burden on the defendant, the fact that Klastech is a German corporation, headquartered in Germany, weighs against jurisdiction. *See Dole Food*, 303 F.3d at 1115. However, Klastech has a designated representative for the USA West with two California telephone numbers, which mitigates Klastech's burden. *See* Burgess Decl. ¶ 2. Klastech's burden is further diminished by the fact that Klastech representatives have traveled to California on several occasions in the past for business, including business directly related to the events that gave rise to this suit. *See Dole Food*, 303 F.3d at 1115. Furthermore, as the Supreme Court

United States District Court
Northern District of California

---

[7] See the above discussion on purposeful availment for the facts that also establish Klastech's purposeful injection into California.

United States District Court
Northern District of California

1    explained in *Burger King*, "because 'modern transportation and communications have made it

2    much less burdensome for a party sued to defend himself in a State where he engages in economic

3    activity,' it usually will not be unfair to subject him to the burdens of litigating in another forum

4    for disputes relating to such activity." *Burger King*, 471 U.S. at 474.  Therefore, the Court finds

5    that the burden on Klastech of litigating in California only weakly favors Klastech.

6         The third factor, conflict with the sovereignty of a defendant's state, requires "an

7    examination of the competing sovereign interests in regulating [the defendant's] behavior.  *Dole*

8    *Food*, 303 F.3d at 1115.  Because Klastech has submitted as uncontroverted evidence the

9    declaration of Burgess that Klastech is headquartered in Germany, the Court must examine the

10   interests of the United States and Germany in adjudicating this dispute.  *See Core-Vent*, 11 F.3d at

11   1489 (stating that the Ninth Circuit focuses on connections to the United States in general, not just

12   to the forum state, in giving weight to the third factor).  Klastech currently has an ongoing

13   relationship with the United States because it is a wholly owned and controlled subsidiary of PTI.[8]

14   Compl. ¶ 3.  Klastech also had an ongoing relationship with the United States during the events

15   that gave rise to this claim because its employees travelled to the United States to attend trade

16   shows and in connection with the Agreement.  Tabibian Decl. ¶¶ 4, 12, 15.  During that time,

17   Klastech used an independent contractor to sell some of its products in California, another

18   connection to the United States.  Burgess Decl. ¶ 4.  Furthermore, the extent of conflict with

19   Germany's interest in adjudicating this suit is unclear.  Although Klastech is headquartered in

20   Germany, GTK has provided affidavits stating that "essentially all of GTK's work pursuant to the

21   Klastech Engagement was performed in California."  Tabibian Decl. ¶ 17.  The Agreement is

22   governed by New York law, not German law.  Compl., Ex. A, Section 8 (Agreement).  Thus,

23   Klastech has a stronger relationship with the United States than the defendants in *Dole Food*,

24   where the court found this factor to "only weakly favor[] the defendants if at all," and the extent of

25   conflict with a foreign state's interest is similarly unclear.  *See Dole Food*, 303 F.3d at 1115.  In

26   light of Klastech's past and ongoing U.S.-based relationships, this factor favors GTK.  *See Dole*

27   _____

28   [8] Although the parties dispute the location of Klastech's principal place of business, they do not
     dispute this connection to the United States.

*Food*, 303 F.3d at 1115.

For factor four, the Court considers the forum state's interest in adjudicating the suit. California has a "'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *See Burger King*, 471 U.S. at 473.  GTK is a California corporation with its principal place of business in California so this factor favors GTK. *See Dole Food*, 303 F.3d 1116.

Factor five, concerning efficiency of the forum, examines the location of the witnesses and the evidence, as well as which substantive law governs the dispute.  *See id.*; *Core-Vent*, 11 F.3d at 1489.  New York law governs the Agreement, but there are no other connections with New York that indicate it would be a more efficient forum than California besides Burgess's sworn declaration that Klastech could more effectively handle this dispute in "an arbitration in New York."[9]  *See* Burgess Decl. ¶ 6.  The Court will not speculate on the location of the relevant Klastech witnesses as neither party has provided evidence on whether they are located in Germany, Arkansas, or California.  Likewise, GTK has not made allegations in the Complaint or provided evidence in its affidavits as to the current locations of its witnesses.  Therefore, at this stage, this factor cannot be said to favor either party.

Factor six, convenience to plaintiff, favors GTK, which is based in California.  "However, in this circuit, the plaintiff's convenience is not of paramount importance." *See Dole Food*, 303 F.3d at 1116.

Finally, the Court considers whether an alternative forum is unavailable.  There is a split in the Ninth Circuit regarding which party bears the burden on this issue, although the great weight of Ninth Circuit authority favors putting the burden on the plaintiff.  *Id.*  Klastech has suggested that Germany or New York would be a valid alternative forum, and GTK has not presented any evidence that it would be precluded from suing Klastech in either jurisdiction.  *See* Burgess Decl. ¶ 6.  GTK counters that jurisdiction in Germany would be inconvenient and unfair, but this is not the relevant standard.  *See Core-Vent*, 11 F.3d at 1490 (citing *Roth*, 942 F.2d at 625) ("Doubtless

---

[9] As discussed below, arbitration in New York is not proper.

United States District Court
Northern District of California

[plaintiff] would prefer not to [litigate in Germany], but that is not the test."). Without any evidence that GTK could not obtain effective relief in Germany, this factor favors Klastech.

In balancing the reasonableness factors, "a number of our cases emphasize the heavy burden on both domestic and foreign defendants in proving a 'compelling case' of unreasonableness to defeat jurisdiction." *Dole Food*, 303 F.3d at 1117 (citing *Roth*, 942 F.2d 617; *Panavision*, 141 F.3d at 1324; *Ballard*, 65 F.3d at 1502; *Sinatra*, 854 F.2d at 1201.)  In finding jurisdiction reasonable, the court in *Dole Food* relied on the nature of the defendants' U.S.-based relationships and the fact that the intended audience of their communications with California was the plaintiff. *Id*.  Similarly, Klastech had, and continues to have, ongoing relationships with the U.S., and GTK was the intended audience of all Klastech's communications with California.  Of the two factors that favor Klastech, factor two (the burden on the defendant) favors Klastech only weakly, and, with regards to factor seven, the Ninth Circuit has held that "[w]hether another reasonable forum exists becomes an issue only when the forum state is shown to be unreasonable." Thus, the Court finds that in light of the "heavy burden" on Klastech to make a "compelling case," Klastech's ongoing relationship with the U.S. and California, and Klastech's purposeful injection into California, it is not unreasonable for California to exercise personal jurisdiction over Klastech.

Having found that Plaintiff established the first two requirements of personal jurisdiction, and that Klastech failed to present compelling evidence that the exercise of jurisdiction would be unreasonable, the Klastech Motion to Dismiss for lack of personal jurisdiction is DENIED.

c.  <u>Triangle is Subject to Specific Jurisdiction</u>

The Court finds that Triangle does not have sufficient contacts "of the sort that approximate physical presence" for the Court to exercise general jurisdiction, nor does GTK oppose Triangle's assertion that this Court lacks general jurisdiction. *See Bancroft & Masters,* 223 F.3d at 1086.  The Court finds that Triangle has sufficient contacts in California related to GTK's claim against it to establish specific jurisdiction. *See Dole Food*, 303 F.3d at 1111.

"Even though there is no general jurisdiction over [Triangle] in California, California courts may still exercise personal jurisdiction if the case arises out of certain forum-related acts."

*See Bancroft & Masters,* 223 F.3d at 1086.  For the reasons discussed below, the Court fins that

GTK has made a prima facie showing that (i) Triangle intentionally committed a "foreign act that

is both aimed at and has effect in the forum state," and (ii) GTK's claim arises out of Triangle's

forum-related activities.  *See id.* at 1086-87.  The Court further finds that Triangle has not

presented "compelling" evidence that the exercise of jurisdiction is unreasonable.  *See id.*

Therefore, the Court will exercise specific, personal jurisdiction over Triangle.

### 1.   Purposeful Direction

        The Ninth Circuit often refers to the first element of specific jurisdiction "in shorthand

fashion, as the 'purposeful availment' prong."  *Yahoo! Inc. v. La Ligue Contre Le Racisme Et*

*L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) (en banc) (per curiam).  Nevertheless,

"[d]espite its label, this prong includes both purposeful availment and purposeful direction."  *Id.*

In tort cases, the relevant inquiry is "whether a defendant *purposefully directs* his activities at the

forum state[.]"  *Id.* (emphasis added) (internal quotations omitted).  "[T]he [Supreme] Court has

allowed the exercise of jurisdiction over a defendant whose only 'contact' with the forum state is

the 'purposeful direction' of a *foreign* act having *effect* in the forum state."  *Haisten v. Grass Valley*

*Medical Reimbursement Fund*, 784 F.2d 1392, 1397 (9th Cir. 1986) (citing *Calder v. Jones*, 465

U.S. 783, 789 (1984)).  Under Ninth Circuit precedent, the purposeful direction requirement for

tort cases is analyzed under the "effects" test derived from *Calder.  See Dole Food*, 303 F.3d at

1111; *see also Yahoo!*, 433 F.3d at 1206 ("In tort cases, we typically inquire whether a defendant

purposefully directs his activities at the forum state, applying an 'effects' test that focuses on the

forum in which the defendant's actions were felt, whether or not the actions themselves occurred

within the forum.").

        GTK asserts a claim for tortious interference with contract against Triangle based on its

alleged fraudulent representations in the Purchase Agreement and concealment of the existence of

the Agreement.  Thus, the *Calder* "effects" test applies to determine whether Triangle purposefully

directed its conduct at California.  *See Panavision,* 141 F.3d at 1321 (stating that because a

trademark infringement and unfair competition case was "akin" to a tort case, the court should

apply the *Calder* "effects" test).  Under *Calder*, "the 'effects' test requires that the defendant

allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Dole Food*, 303 F.3d at 1111. However, courts need not only consider those contacts that involve wrongful acts by the defendant. *See Yahoo!*, 433 F.3d at 1207. The Ninth Circuit has held that *Calder* does not "require in purposeful direction cases that all (or even any) jurisdictionally relevant effects have been caused by wrongful acts." *Id.* at 1208. Thus, the Court considers the alleged tortious act of Triangle as well as its other alleged contacts with California in considering whether specific jurisdiction is proper.

### i.   Intentional Act

The first prong of purposeful direction is easily satisfied and generally glossed over by the courts. *See Dole Food*, 303 F.3d at 1111 ("Because it is clear that [Plaintiff] has sufficiently alleged that [defendants] acted intentionally, we skip to the 'express aiming requirement.'"). GTK need only allege that Triangle acted intentionally when it represented to PTI that Klastech had no obligations to any investment bank in connection with the Transaction. GTK alleges that despite Triangle's awareness of the Agreement, Triangle knowingly made false representations to PTI, and wrongfully failed to disclose the Agreement, with the intent to induce Klastech to breach the Agreement and to deprive GTK of the payments and other benefits due it under the Agreement. Compl. ¶¶ 26-27. GTK refers to email communications between Tabibian and Langhans, in which Langhans represents herself as reaching out to GTK on behalf of Triangle for its assistance in "identifying potential M&A possibilities" for Klastech and "mak[ing] [Klastech] attractive for an exit." Exs. 1, 5. GTK also provides email communications in which Langhans, appearing to represent Triangle, discusses PTI with GTK. Ex. 3. GTK has sufficiently alleged that Triangle acted intentionally when it represented in the Purchase Agreement that Klastech had no obligations to any investment bank or other entity in connection with the Transaction. Compl. ¶ 27.

### ii.   Express Aiming at Forum State

The "express aiming" requirement "is satisfied when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of

21

the forum state." *Bancroft & Masters*, 223 F.3d at 1087; *see also Dole Food*, 303 F.3d at 1112 ("Because [defendants] knew that Dole's principal place of business was in California, and communicated directly with those California decision makers, we conclude that their actions were 'expressly aimed' at the forum state."); *Data Disc, Inc. v. Sys. Tech. Assoc.*, 557 F.3d 1280, 1288 (9th Cir. 1977) ("The inducement of reliance in California is a sufficient act within California to satisfy the requirement of minimum contacts where the cause of action arises out of that inducement."). However, the Supreme Court recently clarified that the plaintiff cannot be the only link between the defendant and the forum, but rather "the defendant's suit-related conduct must create a substantial connection with the forum State." *Walden v. Fiore*, 134 S. Ct. 1115, 1121-22 (2014) (citing *Helicopteras Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984) ("[The] unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction")). The Court explained that "these same principles apply when intentional torts are involved." *Id*. at 1123.

In *Walden*, the plaintiffs, who were Nevada residents, sought to establish Nevada's personal jurisdiction over defendant Walden, a Georgia police officer, who seized a large amount of cash from the plaintiffs in Georgia and then allegedly submitted a false probable cause affidavit justifying the seizure. *Id*. at 1117. The Ninth Circuit held that Walden's submission of the false affidavit with the knowledge that it would affect persons with significant Nevada contacts demonstrated sufficient minimum contacts with Nevada related to the claim for Nevada to exercise specific, personal jurisdiction. *Id*. at 1120. The Supreme Court reversed, explaining that the Ninth Circuit improperly shifted the focus of its minimum contacts analysis from defendant's contact with the forum to defendant's contact with the plaintiffs. *Id*. at 1124. Despite the plaintiffs' allegations that they suffered the harm in Nevada, the Court found that no part of the defendant's course of conduct occurred in the forum state, and he formed no jurisdictionally relevant contacts with that forum. *Id*. In sum, the plaintiffs' injury occurred in Nevada simply because that is where plaintiffs chose to be when they desired to use the seized funds, but "none of [the defendant's] challenged conduct had anything to do with Nevada itself." *Id*. at 1125.

The Court explained that relevant conduct on the part of a defendant for establishing jurisdiction was conduct in which a defendant "purposefully 'reach[ed] out beyond' [his] State and into another." *Id*. at 1112 (citing *Burger King*, at 471 U.S. at 479-80). The Court emphasized that "although physical presence is not a prerequisite to jurisdiction, physical entry into the State - either by the defendant in person or through an agent, goods, mail, or some other means - is certainly a relevant contact." *Id*. (citations omitted). The Court cited "entering a contractual relationship that 'envisioned continuing and wide-reaching contacts' in the forum State" as an example of a defendant establishing sufficient contact with the forum without physical presence in the state. *Id*. at 1112 (citing *Burger King*, at 471 U.S. at 479-80). The Court also cited a case in which jurisdiction was proper over defendants who "circulat[ed] magazines to 'deliberately exploi[t]' a market in the forum State, despite never physically entering the borders. *Id*. (citing *Keeton v. Hustler Magazine, Inc*., 465 U.S. 770, 781 (1984)).

The Court went on to cite with approval *Calder*'s application of the principle that "[a] forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum." *Id*. at 1123. In *Calder*, the Court held that a libelous article written about an entertainer who lived and worked in California in a newspaper published in Florida, but with a large circulation in California, was "expressly aimed" at California "based on the 'effects' of their Florida conduct in California." *Calder*, 465 U.S. at 789. Jurisdiction was proper because "California [wa]s the focal point both of the story and of the harm suffered." *Id*. at 789. Specifically, (i) the activities that were the subject of the story took place in California, (ii) the story was drawn from California sources, (iii) the defendants knew the plaintiff lived and worked in California, and (iv) the defendants knew the plaintiff would feel the reputational harm in California. *Id*. at 788-90. According to the Supreme Court in *Walden*, the key to the exercise of personal jurisdiction in *Calder* was that "the 'effects' caused by defendants' article - *i.e.*, the injury to the plaintiff's reputation in the estimation of the California public - connected the defendants' conduct to *California*, not just to a plaintiff who lived there" because the defendants intentionally circulated the article in California. *Walden*, 134 S. Ct. at 1124.

1    In determining whether Triangle "expressly aimed" its conduct at California, the Court

2    examines whether Triangle's "suit-related conduct" "connects [it] to the forum in a meaningful

3    way." *See id*. at 1121-22, 25.  Relevant contacts include physical presence in the state, as well as

4    conduct demonstrating that Triangle "reached out beyond" its borders to create substantial contact

5    with California.  *See id*. at 1112.

6    The Court finds that Triangle's conduct establishes these necessary contacts with

7    California.  First, GTK has presented evidence that Triangle "reached out beyond" Germany to

8    GTK in California, after identifying it through a web search, to negotiate the Agreement for

9    services.  Tabibian Decl. ¶ 4.  Triangle principal, Langhans, then entered California's borders to

10   meet with Tabibian, a decision-maker for GTK, in San Francisco on March 9, 2010 to discuss the

11   business and sale prospects for Klastech.  *Id*.  This conduct led to a continuing relationship with

12   GTK in California during which GTK provided advice to Klastech and Triangle on approach

13   strategies for potential acquirors, including several California-based corporations and PTI, the

14   company with which Triangle entered the Purchase Agreement.  Tabibian Decl. ¶ 12-13; Compl. ¶

15   30.  Also relevant, although not sufficient on its own, is that Triangle's allegedly fraudulent

16   representations in the Purchase Agreement caused GTK economic injury in California, where

17   Triangle knew that GTK was based.  *See Calder*, 465 U.S. at 788-89 (finding as relevant to

18   personal jurisdiction that defendants knew that plaintiff lived and worked in California and would

19   feel the reputational harm in California).

20   Therefore, the Court finds that GTK's economic injury in California is connected to

21   contacts that "'[D]efendant [it]self' created with the forum state," by way of reaching out to a

22   California corporation to negotiate a beneficial relationship (including traveling to California to do

23   so) which lead to continuing contacts with Plaintiff in California and ultimately injury, in

24   California, "targeted at a plaintiff whom the defendant knows to be a resident of the forum state."

25   *See Bancroft & Masters*, 223 F.3d at 1087.  Therefore, the Court finds that Triangle's "intentional,

26   and allegedly tortious, actions were expressly aimed at California."  *See Bancroft & Masters*, 223

27   F.3d at 1087.

28

United States District Court
Northern District of California

24

iii.   Causing Harm in the Forum State

The final element of the *Calder* "effects" test is satisfied if Plaintiff can show that "a jurisdictionally sufficient amount of harm is suffered in the forum state." *Yahoo!*, 433 F.3d at 1207 (en banc) (overruling prior decisions which required "the 'brunt' of the harm" to be suffered in the forum state and clarifying that "[i]f a jurisdictionally sufficient amount of harm is suffered in the forum state, it does not matter that even more harm might have been suffered in another state.")  The Ninth Circuit has relied on a corporation's principal place of business in determining the location of its economic injury.  *See Dole Food*, 303 F.3d at 1114.  "[W]hen a forum in which a plaintiff corporation has its principal place of business is in the same forum toward which defendants expressly aim their acts, the 'effect' test permits that forum to exercise personal jurisdiction."  *Id.*  Accordingly, in *Dole Food*, the Ninth Circuit held that, where the defendants had expressly aimed their conduct at the same forum where plaintiff had its principal place of business, the plaintiff suffered a jurisdictionally sufficient amount of harm in the forum state.  *Id.*

Following *Dole Food*, GTK has suffered a jurisdictionally sufficient amount of harm in California because (i) Triangle's tortious conduct satisfies the "express aiming" requirement and (ii) GTK's principal place of business is in California, which is therefore the location of its economic injury.  *See* Compl. ¶ 5.  Specifically, GTK alleges that, as a result of Triangle's harmful conduct, Klastech has refused to pay sums due under the Agreement of not less than $400,000 and to acknowledge publicly GTK's role in the Transaction per the Agreement.  Compl. ¶¶ 19, 24, 29.  As a result, GTK asserts that it has been damaged in California in an amount not less than $400,000 plus the additional costs, including attorneys' fees, it has been forced to incur to enforce its rights.  Compl. ¶ 29.

The Court finds that the foregoing constitutes a "jurisdictionally sufficient" amount of harm that GTK suffered in California and that GTK has established the final element of the *Calder* "effects" test.  Accordingly, the Court finds that GTK's allegations demonstrate that Triangle purposefully directed its conduct at California.

*2.   Relatedness of the Claim*

United States District Court
Northern District of California

United States District Court
Northern District of California

1    "The second requirement for specific, personal jurisdiction is that the claim asserted in the

2    litigation arises out of the defendant's forum related activities."  *Panavision*, 141 F.3d at 1322.

3    The Court must determine if GTK would not have been injured "but for" Triangle's conduct

4    directed towards GTK in California.  *See id.*  Triangle argues GTK cannot establish this element

5    because any alleged conduct would have occurred in Germany and because its claim is "so loosely

6    attenuated" and any contact "so extremely limited" as to make the prospect that Triangle could be

7    haled into court in California unforeseeable.  Triangle Motion at 8.  This argument fails to take

8    into account the full extent of conduct that GTK alleges caused it harm in California.

9           GTK alleges that Triangle, through Langhans and Geiger, negotiated a contract between

10   GTK and Klastech in California and then, through false representations in the Purchase

11   Agreement, induced Klastech to deny GTK the payment and recognition due in California under

12   the Agreement.  Compl. ¶¶ 19, 24, 29.  GTK further presents evidence that, throughout the course

13   of the Agreement, it communicated regularly (several times a week, sometimes daily) with

14   Triangle personnel via telephone and email in the performance of its work.  Tabibian Decl. ¶¶ 7,

15   11, 12.  In sum, GTK has sufficiently demonstrated that "but for" Triangle's reaching out to GTK

16   in California, negotiating the Agreement with GTK on behalf of Klastech, continuing to

17   communicate with GTK during the course of its performance of the Agreement, and representing

18   to PTI that Klastech had no obligations to any investment company, GTK would not have suffered

19   harm in California.  *See Panavision*, 141 F.3d at 1322.  Accordingly, GTK's allegations and

20   affidavits show that its claim against Triangle arises out of Triangle's forum related contacts.

21                         *3.   Reasonableness*

22          Next, the Court considers the seven reasonableness factors in turn.  For factor one, the

23   Court finds that Triangle's activities, which satisfy the "purposeful direction" prong, demonstrate a

24   sufficient level of purposeful injection into the forum state to support a finding of reasonableness.

25   *See Dole Food*, 303 F.3d at 1114-15.  Triangle principals, Langhans and Geiger, knew GTK had

26   its principal place of business in California, reached out and negotiated the Agreement with GTK

27   on behalf of Klastech, repeatedly communicated with GTK pursuant to the Agreement, and

28   allegedly acted with the intent to deprive GTK of the benefits due it under the Agreement.  *See*

26

Tabian Decl. ¶¶ 3, 4, 6, 7, 13, 17; Compl. ¶ 27.

Factor two, burden on defendant, weighs more strongly in favor of Triangle than it does for Klastech because Triangle has no ongoing presence in the United States or California.[10]  *See* Geiger Decl. ¶ 5.  Specifically, Triangle is a German corporation, headquartered in Germany, with no evidence of any connections to California outside of the events that gave rise to this claim. Geiger Decl. ¶¶ 2-10.  While Langhans traveled to California once in connection with the events that gave rise to this claim, there is no evidence that Triangle employees regularly travel to the United States.  Therefore, while not dispositive in light of "modern advances in communications and transportation," this factor favors Triangle.  *See Dole Food*, 303 F.3d at 1115 (citing *Sinatra*, 854 F.2d at 1199).

For factor three, in its "an examination of the competing sovereign interests in regulating [the defendant's] behavior," the Court finds that Triangle's relationship with the United States is stronger than that of the defendants in *Core-Vent* but weaker than the U.S.-based relationships in *Dole Food*.  *See Dole Food*, 303 F.3d at 1115.  Unlike the Swedish doctors in *Core-Vent,* who had no U.S.-based relationships and no knowledge that their actions would impact California, Triangle principals, Langhans and Geiger, intentionally initiated a relationship on behalf of Klastech with GTK in California, knowing GTK was based there, and participated in ongoing communications with GTK in the course of that relationship.  *See* Tabibian Decl. ¶¶ 3, 4, 6, 7, 13, 17.  According to the Complaint, Triangle also intentionally directed its tortious conduct at California when it entered into a contractual relationship with PTI, another U.S.-based company.  Compl. ¶ 27. However, unlike the defendants in *Dole Food*, Triangle has had no employment relationship with the United States.  *See Dole Food*, 303 F.3d at 1115.  Triangle's connections to Germany are the same as Klastech's, and therefore, the extent of conflict with Germany's interest in adjudicating this suit is similarly unclear.  *See* Tabibian Decl. ¶ 17.  In sum, the sovereignty factor favors

---

[10] Ninth Circuit precedent is split on whether "the corresponding burden on plaintiff in bringing the claims against the defendant in an alternate forum should lessen the impact of this factor on the overall reasonableness determination."  See *Core-Vent*, 11 F.3d at 1488-89 (comparing, e.g., *Pacific Atlantic Trading Co. v. M/V Main Exp.,* 758 F.2d 1325 (9th Cir. 1985) with *Sinatra*. 854 F.2d at 1199).  The Court does not attempt to reconcile these standards but addresses convenience to plaintiff in factor six, following the court in *Dole Food*.  *See Dole Food*, 303 F.3d at 1116.

United States District Court
Northern District of California

Triangle but does not weigh heavily as it did in *Core-Vent*.

Fourth, California has a "'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *See Burger King*, 471 U.S. at 473. Because GTK is a California corporation with its principal place of business in California, this factor favors GTK. *See Dole Food*, 303 F.3d 1116.

For the fifth factor, it is difficult to determine on the current record whether California would be the most efficient forum for resolution of the dispute. The parties do not offer evidence regarding the location of the witnesses and evidence, but presumably there are some witnesses in Germany (where Triangle is based) and some in California (where GTK is based) so neither forum has a clear efficiency advantage with respect to witnesses. *See id.* Likewise, the parties do not discuss which substantive law should govern GTK's tort claim.[11] Following the lead of the Ninth Circuit in *Dole Food*, we do not determine here whether German or California law applies, as this determination depends upon the jurisdiction's choice of law rules.[12] We note only that there is no evidence in the record as to whether the relevant provisions of German and California law actually conflict, and, if they do, that German law would be applicable in the event of a conflict, based upon a consideration of the competing interests.[13] Therefore, at this time, an analysis based on the

---

[11] "California has jettisoned the relatively predictable choice of law rules based on place where the transaction occurred (lex locus) in favor of a three-part governmental interest test." *Arno v. Club Med Inc.*, 22 F.3d 1464, 1467 (9th Cir. 1994) (citing *Reich v. Purcell*, 432 P.2d 727 (Cal. 1967)). "Under this amorphous and somewhat result-oriented approach, we must first consider whether the two states' laws actually differ; if so, we must examine each state's interest in applying its law to determine whether there is a 'true conflict'; and if each state has a legitimate interest we must compare the impairment to each jurisdiction under the other's rule of law." *Id.* "[T]he law of the sovereign with the greater interest in having its law applied controls." *See id.*

[12] New York law, which governs the Agreement and the Purchase Agreement, does not apply because GTK's claim against Triangle sounds in tort, not contract.

[13] "Public interest factors include court congestion, local interest in resolving the controversy, and preference for having a forum apply a law with which it is familiar." *See Dole Food*, 303 F.3d at 1119 (citing *Lockman Found v. Evangelical Alliance Mission*, 930 F.2d 764, 771 (9th Cir. 1991)). Neither party has offered any evidence about relative court congestion in Germany and in California. *See id.* GTK's claims allege interference with contract perpetrated against GTK in California, and "California has an interest in protecting corporations based in California." *See id.* Germany's interest in litigation stems from Triangle's residency, and thus may be secondary to California's interest in redressing fraud against its corporations. *See id.*

substantive law does not clearly favor either party.  In *Core-Vent*, the fact that the lawsuit would continue with the other parties in the plaintiff's chosen forum "tip[ped] the efficiency factor in [the plaintiff's] favor."  *See Core-Vent*, 11 F.3d at 1489.  Accordingly, the fact that this Court will exercise personal jurisdiction over Klastech tips this factor in GTK's favor, though only slightly.

Factor six, convenience to plaintiff, favors GTK, which is based in California, but is "is not of paramount importance" in this circuit.  *See Dole Food*, 303 F.3d at 1116.

Factor seven, unavailability of an alternative forum, follows a similar analysis for Triangle as it did for Klastech.  Triangle has not suggested an alternative forum, but presumably it would prefer to adjudicate this dispute in Germany.  As mentioned above, GTK has not presented any evidence that it could not obtain effective relief in Germany.  Therefore, without deciding which party bears the burden of proving unavailability of an alternative forum, this factor favors Triangle.

The reasonableness factors weigh slightly in Triangle's favor due to Triangle's lack of ongoing contacts with California or the United States.  Nevertheless, Ninth Circuit jurisprudence emphasizes the "heavy burden" of proving a "compelling case" of unreasonableness and has tended to find jurisdiction is reasonable when the factors do not clearly favor either party.  *See Dole Food*, 303 F.3d at 1117; *Caruth v. International Psychoanalytical Ass'n*, 59 F.3d 126 (9th Cir. 1995) ("[G]iven the closeness of the factors, we conclude that [defendant] has not presented a 'compelling case' that exercising jurisdiction over it would be unreasonable.")  Considering all the factors in light of the defendant's burden of presenting a "compelling case," its purposeful injection into California, and its ability to manage travel to and communications with California in the course of the Agreement, the Court concludes that the exercise of jurisdiction over Triangle in California is reasonable.

Having found that GTK established the first two requirements of personal jurisdiction, and that Triangle failed to present compelling evidence that the exercise of jurisdiction would be unreasonable, the Court will assert personal jurisdiction over Triangle.  The Triangle Motion to Dismiss for lack of personal jurisdiction is therefore DENIED.

United States District Court
Northern District of California

**B.  Subject Matter Jurisdiction**

a.  <u>Legal Standard</u>

Although section 4 of the Federal Arbitration Act provides for the filing of a motion to compel arbitration, courts have held that a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction "is a procedurally sufficient mechanism to enforce [an] [a]rbitration [p]rovision." *Filimex, L.L.C. v. Novoa Investments, L.L.C.,* No. CV 05-3792-PHX-SMM, 2006 WL 2091661, at *2 (D. Ariz. July 17, 2006) (citing *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc*., 252 F.3d 707, 709-10 (4th Cir. 2001) (holding that as long as the party made clear that it was seeking enforcement of the arbitration clause in its motion to dismiss, it had sufficiently "invoke[d] the full spectrum of remedies under the FAA")); *see also Interactive Flight Technologies, Inc. v. Swissair Swiss Air Transport Co., Ltd.,* 249 F.3d 1177, 1179 (9th Cir. 2001) (citing the Supreme Court's holding in *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 86 (2000), that an order dismissing an action remains a "final decision" within the traditional understanding of that term, notwithstanding that dismissal was in favor of arbitration); *Lewis v. UBS Financial Services Inc.,* 818 F. Supp. 2d 1161, 1165 (N.D. Cal. 2011) ("Where the claims alleged in a pleading are subject to arbitration, the Court may stay the action pending arbitration or dismiss the action.").  Rule 12(b)(1) is appropriate for dismissing claims subject to arbitration because it "is a flexible rule" that often serves as a vehicle for raising residual defenses and the Federal Arbitration Act requires only that a party "petition" the court for an order directing arbitration to proceed.  *Id*.  Pursuant to the Federal Arbitration Act, arbitration may be compelled if the following three elements are shown: a written agreement to arbitrate, a dispute within the scope of the arbitration agreement, and a refusal to arbitrate.  9 U.S.C. § 4.

When a defendant moves to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure, the plaintiff, as the party seeking to invoke the court's jurisdiction by filing the complaint, bears the burden of establishing subject matter jurisdiction.  *See Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994).  A defendant may attack the court's jurisdiction as it appears on the face of the complaint or by presenting affidavits and other evidence.  *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  For a facial attack, the court

1   must "accept all allegations in the complaint as true and construe them in the light most favorable

2   to the plaintiff[]." *See id*.  The plaintiff must plead sufficient facts in the complaint to establish the

3   court's jurisdiction.  Fed. R. Civ. P. 8(a)(1).  In contrast, with a factual challenge, courts do not

4   accept as true all facts in a plaintiff's complaint and may evaluate extrinsic evidence and resolve

5   factual disputes where necessary.  *See Roberts v. Corrothers*, 812 F.2d 1173 (9th Cir. 1987).  In

6   response to a factual challenge, the plaintiff must present sufficient evidence to support the court's

7   subject matter jurisdiction.  *See Savage v. Glendale Union High School, Dist. No. 205, Maricopa*

8   *County*, 343 F.3d 1036, 1040 n.2 (9th Cir. 2003).  Here, Klastech has presented the Court with

9   evidence of the Purchase Agreement, whose arbitration clause it claims governs the dispute and

10  renders the Court's exercise of subject matter jurisdiction improper.  Therefore, the Court will

11  consider extrinsic evidence and resolve factual disputes where necessary.

12              b.   Claims Not Subject to Arbitration

13          Klastech challenges the Court's subject matter jurisdiction by asserting that GTK's claim

14  against it is subject to arbitration in New York pursuant to the Purchase Agreement.  Klastech

15  argues that a nonsignatory may be compelled to arbitrate its claims if they are based on that

16  defendant's breach of an agreement which provides for arbitration, in this case the Purchase

17  Agreement.  However, GTK's breach of contract action against Klastech is not based on Klastech's

18  breach of the Purchase Agreement with PTI but rather its breach of the Agreement with GTK,

19  which does not provide for arbitration.  Therefore, the arbitration clause of the Purchase

20  Agreement does not bind GTK in the resolution of its claim against Klastech.

21          While arbitration is contractual in nature, nonsignatories may be obligated to arbitrate a

22  dispute.  *Letizia v. Prudential-Bache Sec., Inc*., 802 F.2d 1185, 1187 (9th Cir. 1986).  In *Letizia v.*

23  *Prudential-Bache Sec., Inc*., the Ninth Circuit explained that "nonsignatories of arbitration

24  agreements may be bound by the agreement under ordinary contract and agency principles,"

25  including incorporation by reference, assumption, agency, veil-piercing/alter ego, estoppel, and

26  third-party beneficiaries.  *Id*. at 1187-88.  Klastech seeks to hold GTK, as a nonsignatory, within

27  the scope of an arbitration clause based upon equitable estoppel, which "precludes a party from

28  claiming the benefits of a contract while simultaneously attempting to avoid the burdens that

United States District Court
Northern District of California

31

1   contract imposes." *See Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006) (quoting *Wash.*

2   *Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 267 (5th Cir. 2004)). "In order to compel a non-

3   signatory to arbitrate under this theory, the non-signatory party must receive a 'direct benefit' from

4   the contract containing the provisions." *Int'l Ins. Agency Servs., LLC v. Revios Reinsurance U.S.,*

5   *Inc.*, 2007 WL 951943 (N.D. Ill. Mar. 27, 2007). Klastech relies on *Comer* and *Int'l Ins. Agency*

6   in support of its position. The Court finds that its reliance on these cases is misplaced.

7        In *Comer*, the Ninth Circuit addressed whether an arbitration clause in investment

8   management agreements between trustees of an ERISA plan and defendant Smith Barney, Inc.

9   bound plaintiff Comer, a participant in the ERISA plan, who was sued Smith Barney under

10  ERISA. *Comer*, 436 F.3d at 1100-01. Although the court recognized that nonsignatories to an

11  arbitration agreement may be bound by it when they "knowingly exploit" the agreement, it went

12  on to hold that Comer did *not* "knowingly exploit the agreement containing the arbitration clause

13  despite having never signed the agreement" where he was merely a participant in trusts managed

14  by others for his benefit. *Id.* at 1102 (quoting *E.I. DuPont de Nemours & Co. v. Rhone Poulenc*

15  *Fiber & Resin Intermediates*, 269 F.3d 187, 195 (3d Cir. 2001)). The court pointed to a lack of

16  evidence that Comer sought to enforce the terms of the management agreements "[]or otherwise

17  take advantage of them." *Id.* The court also determined that merely "by bringing [his] lawsuit,

18  which he base[d] entirely on ERISA, and not on the investment management agreements," Comer

19  did not attempt to enforce the agreements. *Id.* The court also rejected Smith Barney's alternate

20  theory that Comer was a third-party beneficiary to the agreement. *Id.* Rather "[t]o sue as a third-

21  party beneficiary of a contract, the third party must show that the contract reflects the express or

22  implied intention of the parties to the contract to benefit the third party." *Id.* (citing *Klamath*

23  *Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1211 (9th Cir. 2000)). The court

24  explained that where the signatories to the investment management agreements did not intend to

25  give Comer, as a beneficiary of the plan, the right to enforce the agreements, he could not be

26  bound to the terms of a contract that he did not sign or otherwise assent to. *Id.*

27        In *Int'l Ins. Agency*, the District Court of the Northern District of Illinois estopped the non-

28  signatory plaintiff from refusing to arbitrate its claims with the defendant. *Int'l Ins. Agency Servs.*,

2007 WL 951943, at 3.  The plaintiff alleged that the defendant deliberately attempted to interfere with plaintiff's business relationships by wrongfully seeking to terminate two agreements (one of which plaintiff negotiated on another party's behalf), which earned plaintiff commissions, profits, and agency fees.  *Id*. at 2.  The plaintiff relied on the agreements, which included arbitration clauses, to prove that defendant wrongfully breached those agreements.  *Id*. at 5.  Where "[t]he essential issue in [plaintiff]'s claim [was] [defendant]'s compliance with the agreement containing the arbitration clause," the court did not see how the plaintiff could "litigate its claims without proving that [defendant] breached or attempted to breach the agreements containing the arbitration agreements."  *Id*.

Here, as in *Comer*, Klastech's invocation of equitable estoppel fails because there is no evidence that GTK "knowingly exploit[ed] the agreement containing the arbitration clause despite having never signed the agreement."  *See id.* at 1102 (quoting *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates*, 269 F.3d 187, 195 (3d Cir. 2001)).  GTK does not seek to enforce the terms of the Purchase Agreement between PTI and Klastech.  Rather, like the plaintiff's claim in *Comer* which did not arise from the agreement with the arbitration clause, GTK's claim, based on an entirely separate contract, does not arise from the Purchase Agreement.  *See id*.  Unlike *Int'l Ins. Agency*, in which the plaintiff's claims were based on the harm it would suffer if the defendant repudiated the agreement, GTK receives no "direct benefit" from the Purchase Agreement, as evidenced by the "no broker" provision.  *See Int'l Ins. Agency*, 2007 WL 951943, at 5.  Although GTK relies on the existence of the Purchase Agreement to prove its claim, GTK does not seek to enforce the Purchase Agreement by proving Klastech's lack of compliance with its terms caused GTK harm.  *See id*. at 2.

Klastech has failed to show that GTK, as a nonsignatory to the Purchase Agreement, benefits from the agreement in a way that would subject it to the arbitration clause under the theory of equitable estoppel.

**IV.   CONCLUSION**

For the foregoing reasons, Defendants' Motions to Dismiss for Lack of Personal Jurisdiction and Defendant Klastech's Motion to Dismiss for Lack of Subject Matter Jurisdiction

1   are DENIED.

2       **IT IS SO ORDERED.**

3   Dated: June 27, 2014

4   _____
    JOSEPH C. SPERO

5   United States Magistrate Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California