UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GT SECURITIES, INC.,<br><br>   Plaintiff,<br><br>   v.<br><br>KLASTECH GMBH, et al.,<br><br>   Defendants. | Case No. 13-cv-03090-JCS<br><br>**ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 130 |

## I. INTRODUCTION

Plaintiff GT Securities, Inc., ("GT," often referenced by the parties as "GTK") moves for summary judgment on its claim that Defendant Klastech GmbH ("Klastech") is in breach of contract for failing to pay a "success fee" purportedly owed to GT. GT's Complaint also includes a claim against Klastech's former majority owner, Triangle Venture Capital Group GmbH & Co. KG Nr. IV ("Triangle"), that is not implicated by the present Motion. The Court held a hearing on May 15, 2015. For the reasons stated below, GT's Motion is GRANTED.[1]

## II. BACKGROUND

### A. Factual Background

GT is an investment bank that provides services including assistance with sales, purchases, and financing of technology companies. Tabibian Decl. (dkt. 130-1) ¶ 3. Klastech is a German corporation that designs and manufactures lasers. Tabibian Decl. ¶ 4. At the start of the events at issue, Klastech was primarily owned by Triangle, a German venture capital fund. *Id.* ¶ 5; Klastech Answer (dkt. 20) ¶ 4. At Triangle's direction, Klastech retained GT to help negotiate the sale or financing of Klastech. *See* Tabibian Decl. ¶¶ 6−9; Klastech Answer ¶ 8. Klastech and GT

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

executed an engagement letter on July 31, 2010.  Tabibian Decl. ¶¶ 9−10 & Ex. C ("Engagement Letter"); Klastech Answer ¶ 8.

GT's claim rests on the following provision of the engagement letter:

> <u>M&A Success Fee:</u> In the event a Transaction is consummated, [Klastech] shall pay or cause to be paid to GTK a M&A Success Fee calculated as follows: $400,000 plus 5% of portion [sic] of the Transaction Value that is in excess of $8,000,000 less fifty percent (50%) of the total amount of the Retainer then paid or payable by [Klastech] under section 2(a) above, provided however that notwithstanding the foregoing the M&A Success Fee shall at a minimum be $400,000 in the event a Transaction is consummated.

Engagement Letter at 3, § 2(b)(i).  Ali Tabibian, the GT advisor and investment banker primarily responsible for Klastech's engagement, states that "GTK insisted on a minimum [$400,000] payment because (1) the Engagement would require substantial effort by GTK—i.e., hundreds of hours; and (2) the value of Klastech was uncertain."  Tabibian Decl. ¶ 9.  Klastech has not offered any evidence disputing that explanation of the fee structure.  The introductory paragraph of the engagement letter defines a "Transaction" as a "transaction through sale, merger, joint venture or other combination, whether effected in a single transaction or a series of related transactions, in which all or a substantial portion of the business or assets of [Klastech] are combined with or transferred to another company."  Engagement Letter at 1.

In the months following execution of the engagement letter, "approximately twenty potential acquirors were contacted, almost all by GTK."  Tabibian Decl. ¶ 12.  Although none of these potential buyers made an offer to purchase Klastech, two executed non-disclosure agreements and held talks directly with Klastech.  *Id.* ¶¶ 12−13.

In December of 2010, Tabibian informed Triangle that he had accepted a position with another investment bank, Citigroup, and would be leaving GT.  *Id.* ¶ 14.  GT sent a short letter to the managing director of Klastech on February 16, 2011, formally notifying Klastech of Tabibian's departure and presenting options for the GT-Klastech engagement.  *Id.* ¶ 14 & Ex. D ("Feb. 2011 Letter"); *see also* Klastech Answer ¶ 12 (admitting authenticity of the letter).  That letter set forth two alternatives: "upon KLASTECH's request," GT would transfer the agreement to Tabibian's new employer, or "upon written notice" Klastech could "terminate the Agreement

1   with no further obligation owed by KLASTECH." Feb. 2011 Letter. Two sentences near the end

2   of the letter play a central role in the parties' present dispute:

> In addition, for the avoidance of doubt, KLASTECH has no payment obligations whatsoever, now or in the future to GTK Partners under the Agreement or otherwise, including without limitation under Sections 2 or 4 of the Agreement. This waiver of rights by GT Securities, Inc. is irrevocable.

6   *Id.* Tabibian informed Bernd Geiger, a "Triangle principal and Klastech board member," by

7   telephone that the option of terminating the agreement "would allow Klastech to keep the

8   engagement open and re-start [with] GTK without the need for payment of a new retainer to a new

9   advisor." Tabibian Decl. ¶¶ 7, 14. According to Tabibian, "Klastech never exercised either

10  option, or formally responded to this letter." *Id.* ¶ 14.

11  In January of 2012, Tabibian returned to GT. *Id.* ¶ 15. Klastech and GT executed a letter

12  agreement dated January 30, 2012, that reads as follows:

> KLASTECH (Karpushko Laser Technologies, GmbH) and GT Securities, Inc. (the underlying broker/dealer for GTK Partners), hereby mutually acknowledge that the engagement letter dated July 31, 2010 (the "Engagement Letter") remains in full force and effect, and the parties mutually waive and rescind the letter dated February 16, 2011.
>
> For the performance of GTK's services under the Engagement Letter, no further retainers are due and no expenses are reimbursable as of the date hereof. The Success Fee paragraph applies to, but is not limited to, current potential acquirers Newport and Zygo.

19  *Id.* ¶ 15 & Ex. E ("2012 Letter Agreement").

20  From January through July of 2012, GT contacted a number of potential buyers on behalf

21  of Klastech, assisted in the development of approach strategies, provided updates to Triangle and

22  Klastech, and prepared a presentation on the value of Klastech's intellectual property. *Id.* ¶ 16.

23  GT did not meet directly with some potential buyers where Klastech personnel had an established

24  relationship, such as Power Technology Inc. ("PTI"), but instead advised Klastech and Triangle on

25  their discussions. *Id.* ¶ 17. In July of 2012, Tabibian inquired with Wiebke Langhans, a Klastech

26  board member, via email regarding the status of negotiations with PTI. *Id.* ¶ 17 & Ex. F.

27  Langhans wrote, "We have just received a response from PTI an [sic] try to schedule a Meeting. I

28  will contact you again." *Id.* Ex. F. Tabibian requested that Langhans clarify whether he should

3

"hold any times open for calls," but did not hear back from her. *Id.* ¶ 17 & Ex. F.

In late January of 2013, Tabibian first heard—after the fact—that PTI had acquired Klastech. *Id.* ¶ 18. That acquisition took the form of a stock sale, with PTI purchasing all outstanding and issued shares of Klastech from Triangle and 123 Venture, a minority owner. Burgess Decl. (dkt. 59-1)[2] Ex. A ("Purchase Agreement") at 1. PTI agreed to pay Triangle and 123 Venture €250,000—equal to $306,222.50 at the exchange rate specified in the agreement— plus the greater of either (1) €300,000 ($367,467) minus amounts paid in connection with a specified bank loan; or (2) a formula consisting primarily of five percent of Klastech's revenue for a period of ten years. *Id.* at 1−3, §§ 1.2, 1.4. The purchase agreement was dated January 21, 2013, *see generally id.*, and Klastech issued a press release announcing the purchase on January 30, 2013, Rushing Decl. (dkt. 130-2) Ex. 1. Despite a provision of the engagement letter requiring Klastech to acknowledge GT in any announcement of a sale, the press release did not mention GT. *See id.*; Engagement Letter at 7, § 6.

GT demanded payment and invoiced Klastech for the $400,000 minimum success fee, plus interest, but Klastech has refused to pay. Tabibian Decl. ¶ 19 & Ex. G. William Burgess, a current officer of Klastech, states that PTI was not aware of GT's existence or involvement in the transaction until GT demanded its success fee. Burgess Decl. ¶ 3.

### B. Procedural History and the Present Motion

GT filed its Complaint against Klastech and Triangle on July 3, 2013. Compl. (dkt. 1). Both Defendants moved to dismiss, asserting a lack of personal jurisdiction. *See generally* Triangle Mot. to Dismiss (dkt. 58); Klastech Mot. to Dismiss (dkt. 59). Klastech also argued that an arbitration clause in the PTI purchase agreement applied to this action, even though GT was not a party to the purchase agreement. Klastech Mot. to Dismiss at 8−9. The Court denied those motions on June 27, 2014, holding that both Defendants were subject to personal jurisdiction and that the arbitration clause of the purchase agreement was not applicable. *See generally* Order Denying Mots. to Dismiss (dkt. 75).[3]

---

[2] The Burgess Declaration was filed in support of Klastech's unsuccessful Motion to Dismiss.
[3] *GT Sec., Inc. v. Klastech GmbH*, C-13-3090 JCS, 2014 WL 2928013 (N.D. Cal. June 27, 2014).

4

GT now moves for summary judgment on its claim against Klastech, on the basis that the stock sale to PTI triggered the success fee provision of the engagement letter. *See generally* Mot. (dkt. 130). GT seeks the minimum $400,000 success payment, plus 1.75% monthly interest under the terms of the engagement letter. *Id.* at 6, 8–9. GT waives for the purpose of the present Motion any claim to additional payment based on Klastech's future sales, and reserves its claim for attorneys' fees for a later motion pursuant to Rule 54(d)(2)(B) of the Federal Rules of Civil Procedure. *Id.* at 6 n.4, 8 n.5. GT's Motion does not encompass the separate claim against Triangle. The Motion is supported by a declaration by Tabibian, attaching the relevant agreements and correspondence between the parties, and a declaration by GT's counsel Geoffrey Rushing, attaching Klastech's press release and interrogatory responses. *See generally* Tabibian Decl; Rushing Decl.

Klastech contends that the Motion should be denied for three reasons. First, Klastech argues that GT is not entitled to a success fee because a stock sale is not a "Transaction" within the meaning of the engagement letter. Opp'n (dkt. 142) at 4−6. Second, Klastech argues that GT irrevocably waived any claim to a success fee in the February 2011 letter, and that the January 2012 letter agreement did not effectively reinstate such a claim, in part for lack of consideration. *Id.* at 6. Finally, Klastech argues that the claim is not subject to summary judgment because financial industry rules incorporated by the engagement letter require any fee to be reasonable, and the reasonableness of the success fee must be decided by a jury. *Id.* at 6−8. Klastech provides no evidence in opposition to GT's Motion, although it cites the purchase agreement attached to a declaration submitted in support of its earlier motion to dismiss.

In its Reply, GT responds that the success fee applies to a stock sale, that GT never actually waived a right to payment and any possible waiver would be superseded by the January 2012 letter agreement, and that the success fee is reasonable and the rules cited by Klastech do not apply to this transaction. *See generally* Reply (dkt. 143).

## III. ANALYSIS

### A. Legal Standard for Summary Judgment

Summary judgment on a claim or defense is appropriate "if the movant shows that there is

5

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Id*. "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986). On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378 (2007), but where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587 (1986).

### B. Contract Interpretation Under New York Law

The engagement letter specifies that it is to be interpreted under the law of New York. Engagement Letter at 8, § 8. Both parties' briefs recite the standard for contract interpretation set forth in *Ashwood Capital, Inc. v. OTG Management, Inc.*, a New York appellate court opinion:

> According to well-established rules of contract interpretation, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms. We apply this rule with even greater force in commercial contracts negotiated at arm's length by sophisticated, counseled businesspeople. In such cases, courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include. Courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing. We instead concern ourselves with what the parties intended, but only to the extent that they evidenced what they intended by what they wrote.

948 N.Y.S.2d 292, 297 (App. Div. 2012) (citations, internal quotation marks, and brackets omitted); *see* Mot. at 7; Opp'n at 5. "Furthermore, 'where contracts are negotiated by counsel for sophisticated commercial parties, courts should interpret ambiguous language to realize the reasonable expectations of the ordinary businessperson.'" *Russell-Stanley Holdings, Inc. v. Buonanno*, 327 F. Supp. 2d 252, 256 (S.D.N.Y. 2002) (quoting *Bank of N.Y. v. Amoco Oil Co.*, 35 F.3d 643, 662 (2d Cir. 1994)) (applying New York law).

Although a contract's ambiguity may preclude summary judgment if the inquiry requires a

factfinder to weigh extrinsic evidence, under New York law a court may resolve ambiguities on summary judgment if the opponent fails to present parol evidence supporting its interpretation. *Mallad Constr. Corp. v. Cnty. Fed. Sav. & Loan Ass'n*, 32 N.Y.2d 285, 290−91 (1973) ("The opponent must also disclose in evidentiary form the particular parol evidence, if any, on which it relies. Otherwise, there are only documents to interpret, and the court may resolve ambiguities appearing in the documents on a motion for summary judgment." (citations omitted)); *see also Vacold LLC v. Cerami*, 545 F.3d 114, 123 (2d Cir. 2008) (applying *Mallad* in a federal case interpreting a contract under New York law).

### C. The Sale to PTI Was a "Transaction"

Klastech argues that it does not owe GT any success fee because no "Transaction," within the meaning of the engagement letter, ever occurred. Opp'n at 4. The engagement letter defines a "Transaction" as a "transaction through sale, merger, joint venture or other combination, whether effected in a single transaction or a series of related transactions, in which all or a substantial portion of the business or assets of [Klastech] are combined with or transferred to another company." Engagement Letter at 1. Klastech contends that because this definition does not explicitly include the words "stock sale," and because it calls for the "business or assets" of Klastech to be "combined with or transferred to another company," it does not encompass PTI's purchase of all shares of Klastech from Triangle and 123 Venture. *See* Opp'n at 1−2.

The sale to PTI was plainly a covered "Transaction." In the language of the engagement letter, there was a "sale . . . in which all . . . of the business" of Klastech was "transferred to another company." *See* Engagement Letter at 1; *see also* Burgess Decl. ¶ 2 & Ex. 1; Tabibian Decl. ¶ 18. Klastech's own press release announced that PTI "has acquired the business of KLASTECH GmbH." Rushing Decl. Ex. 1. Klastech's position that the engagement letter does not encompass a stock sale is inconsistent with the terms of that agreement, which specifically contemplates "a sale of shares." *See* Engagement Letter at 4, § 2 (setting forth a method to determine "Transaction Value . . . in the event of a sale of shares"). The engagement letter also specifically contemplates transactions in which consideration is "payable to [Klastech] and/*or its shareholders*." *Id.* (emphasis added). To the extent that there is any ambiguity on this point, "the

7

reasonable expectations of the ordinary businessperson" would certainly not exclude a stock sale—a common form of business acquisition—from an agreement to facilitate a merger or acquisition without clear indication that such an exclusion was intended by the parties. *See Russell-Stanley Holdings*, 327 F. Supp. 2d at 256.[4]

### D. The Success Fee Provision Was in Force at the Time of the Sale

Klastech's second argument relates to the effects of the February 2011 letter and the January 2012 letter agreement. According to Klastech, GT waived any right to a success fee in the February 2011 letter, but left intact its ongoing obligation to provide services to Klastech. *See* Opp'n at 3, 6. The latter part is crucial, because if the February 2011 letter also terminated GTK's obligations, then the 2012 letter agreement reaffirming the original engagement letter would be supported by consideration—i.e., GT's renewed agreement to assist in facilitating a sale.

The operative portion of the February 2011 letter takes the form of a single long paragraph. For ease of comprehension and reference, the letter is set forth here with each sentence as a separately numbered paragraph:

> [1] [S]hould the engagement between KLASTECH . . . and GT Securities, Inc. (the underlying broker dealer for GTK Partners) . . . require the performance of further services by Mr. Tabibian, we will accommodate the transfer of the Agreement to Citigroup promptly, upon KLASTECH's request, at no additional cost to KLASTECH and we agree that upon such transfer no further obligation is owed by KLASTECH to GT Securities, Inc. whatsoever and GT Securities, Inc. will have no further rights under the Agreement.
>
> [2] GT Securities, Inc. agrees that without limiting the foregoing, upon such transfer of the Agreement KLASTECH will have no obligation to make any payment to Citigroup under Section 2(a) of the Agreement or to GT Securities, Inc. under Sections 2 and 4 of the Agreement.[5]
>
> [3] Alternatively, we agree that due to the departure of Mr. Tabibian who was the Key Person under the Agreement KLASTECH may terminate the Agreement with no further obligation owed by KLASTECH to GT Securities, Inc. whatsoever at any time following the date hereof upon written notice to GT

---

[4] Because the Court rejects Klastech's interpretation of the engagement letter, the Court need not address the significance of Klastech's failure to raise that argument in response to interrogatories. *See* Reply at 4−5.
[5] Section 2 of the engagement letter includes the retainer that Klastech paid to GTK at the outset of the engagement. Section 4 includes the success fee provision.

>Securities, Inc.
>
>[4] GT Securities, Inc. agrees that without limiting the foregoing, upon such termination by KLASTECH at any time hereafter, KLASTECH will have no obligation to make any payments to GT Securities, Inc. under Sections 2 or 4 of the Agreement.
>
>[5] In addition, for the avoidance of doubt, KLASTECH has no payment obligations whatsoever, now or in the future to GTK Partners under the Agreement or otherwise, including without limitation under Sections 2 or 4 of the Agreement.
>
>[6] This waiver of rights by GT Securities, Inc. is irrevocable.
>
>[7] GT Securities, Inc. will continue to be bound by the confidentiality and non-disclosure obligations set forth in Section 5 of the Agreement even after such transfer or termination.

Feb. 2011 Letter (numbers, paragraph breaks, and footnote added). The dispute here turns primarily on the fifth sentence, which states that "KLASTECH has no payment obligations . . . to GTK Partners," and on the sixth, which states that GT's waiver of rights is irrevocable. *See id.*

GT argues that these sentences constitute "a further explanation of the effect of an acceptance of GTK's offer, not a unilateral waiver of rights." Mot. at 10. That construction is not persuasive. The first through fourth sentences, setting forth the alternative offers, each use the future tense, and each include an explicit condition—"upon KLASTECH's request," "upon such transfer," "upon written notice," or "upon such termination." Feb. 2011 Letter. In contrast, the fifth sentence has no such explicit condition, is written in the present tense, and states that "KLASTECH has no payment obligations whatsoever, *now* or in the future." *Id.* (emphasis added). The Court is satisfied that the fifth sentence refers to the time that the letter was sent, not to the outcome of Klastech accepting one of GT's offers.

In the Court's view, however, another distinction between the fifth sentence and the remainder of the letter is also significant: the fifth sentence refers to Klastech's obligations to "GTK Partners," not to "GT Securities, Inc." *See id.* Although the original engagement letter refers throughout to Klastech's relationship with (and potential obligations to) "GTK," that term is defined as meaning "GT Securities, Inc." *See* Engagement Letter at 1. Thus, the fifth sentence of the February 2011 letter avoids any ambiguity by clarifying that whatever happens with respect to Klastech's obligations to GT Securities, Inc., Klastech has no obligation to GTK Partners—which

9

appears to be a separate legal entity. *See id.* at 1 ("GT Securities, Inc. is the underlying broker/dealer for GTK Partners."); Feb. 2011 Letter (referencing "GT Securities, Inc. (the underlying broker dealer for GTK Partners)"); 2012 Letter Agreement (same).[6]

That construction is far more plausible than Klastech's contention that GT unilaterally waived all rights to payment without any corresponding benefit in return. Aside from its inherent irrationality, Klastech's construction makes little sense in the context of the letter as a whole. It would make the second and fourth sentences entirely redundant—if the letter automatically waived any right to payment, than there would be no reason to specify that Klastech "will have no obligation to make any payment" if it accepts either offer. *See id.* Klastech's construction also fails to explain the distinction between "GT Securities, Inc." and "GTK Partners."

To the extent that there is any ambiguity, the Court must "interpret ambiguous language to realize the reasonable expectations of the ordinary businessperson." *See Russell-Stanley Holdings*, 327 F. Supp. 2d at 256. It would not be reasonable to expect GT to waive its right to payment while maintaining an open-ended obligation to provide services under the engagement letter—particularly given that GT could have instead simply terminated the engagement letter on ten days' notice. *See* Engagement Letter at 6, § 4.[7] The Court therefore holds that the disputed provision of the February 2011 letter merely clarifies that Klastech has no obligation to GTK Partners, which is not a party to this action. The letter did not unilaterally waive Klastech's obligations to GT Securities, Inc.

Undisputed evidence in the record indicates that Klastech never accepted either option presented in the February 2011 letter. *See* Tabibian Decl. ¶ 14 ("Klastech never exercised either option, or formally responded to this letter."). Klastech's obligation to pay a success fee to GT

---

[6] At the hearing, neither party's counsel knew whether GTK Partners is a separate entity from GT Securities, Inc., but the only evidence in the record indicates that it is.

[7] Klastech's counsel argued at the hearing that GT waived its right to payment because: (1) GT could no longer honor its obligations after Tabibian left the firm and was therefore in breach; (2) GT had no right to terminate the engagement; and (3) waiving GT's right to payment would prevent Klastech from suing for breach. Of the flaws in this analysis, the most glaring is that GT had an unconditional right under the engagement letter to terminate the engagement on ten days' notice, with the only consequence being that GT would not be entitled to collect any fees. Engagement Letter at 6, § 4. There is therefore no reason why GT would instead opt to waive fees *without* terminating its obligations.

pursuant to section 4 of the engagement letter therefore remained in force. Based on this interpretation of the February 2011 letter, the Court need not address whether the 2012 letter agreement reaffirming the engagement letter is separately enforceable.

If, in the alternative, the February 2011 letter were understood to waive GT Securities, Inc.'s right to a success fee under the engagement letter, the only reasonable interpretation of such a waiver would be that it terminated the engagement. As discussed above, no rational business entity would, without getting anything in return, waive its right to payment but maintain an obligation to provide services, particularly where the contract at issue gave that party a unilateral right to terminate it. Under this view of the February 2011 letter, GT presented the two alternatives in the letter—transfer to Citigroup or termination with no further obligations—as Klastech's only two options, with no third choice of continuing under the original terms of the engagement letter. There is some parol evidence to support that interpretation: soon after the letter was sent, Tabibian informed a Klastech board member that the termination option "would allow Klastech to keep the engagement open and re-start with GTK without the need for payment of a new retainer to a new advisor," suggesting that *even if Klastech wanted to continue the engagement with GT*, it must exercise one of the two options in the letter in order to do so. Tabibian Decl. ¶ 14. There is also no indication that either party acted as if GT was required to provide services under the engagement during the period between the February 2011 letter and the January 2012 letter agreement. *See id.* ¶¶ 12, 16−17 (describing services provided by GT before and after, but not during, that period). Klastech has provided no evidence whatsoever to support its contention that the parties understood GT would waive its success fee but would continue to be bound by its obligation to provide services.

Thus, even if the Court assumes for the sake of argument that the February 2011 letter waived GT's right to a success fee, that interpretation compels the conclusion that the February 2011 letter effectively terminated the engagement letter (other than the confidentiality and non-disclosure provisions specifically reserved). If GT was no longer obligated to provide services after that letter, then the January 2012 letter agreement was a valid contract supported by consideration from both parties. GT reassumed its obligation to provide services in return for

11

1 Klastech reassuming its obligation to pay a success fee if a "Transaction" occurred. The outcome
2 is the same as under the Court's primary analysis above: at the time that PTI purchased Klastech,
3 the success fee provision was in effect and required Klastech to pay at least the minimum
4 $400,000 payment to GT.

### E. There Is No Issue of Material Fact as to Reasonableness

Klastech finally argues that summary judgment is not appropriate because a jury must determine whether the success fee provision is reasonable. That argument is based on section 11 of the engagement letter, which provides in relevant part that "GTK will comply with applicable United States federal and state and any foreign securities laws and regulations concerning the activities of securities brokers or dealers in performing its services hereunder." Engagement Letter at 9, § 11. According to Klastech, that provision incorporates rules promulgated by the Financial Industry Regulatory Authority ("FINRA")[8] governing the reasonableness of brokers' fees. *See* Opp'n at 6−7. Rule 2121 requires that "[i]n securities transactions, . . . if a [broker] buys for his own account from his customer, or sells for his own account to his customer, he shall buy or sell at a price which is fair, taking into consideration all relevant circumstances." FINRA Rule 2121.[9] Rule 2122 provides that "[c]harges, if any, for services performed . . . shall be reasonable and not unfairly discriminatory among customers." FINRA Rule 2122.[10] Klastech focuses on official commentary to Rule 2121, which discusses a guideline that mark-ups on transactions governed by that rule should not exceed five percent. *See* Opp'n at 7; Rule 2121 (Supp'l Material .01: Mark-Up Policy). Klastech argues that the $400,000 success fee is unreasonable because it exceeds the €250,000 up-front purchase price[11] that PTI paid to acquire Klastech. Opp'n at 7.

---

[8] The parties also cite these rules as "NASD" rules, referring to a predecessor organization to FINRA.
[9] Available at: http://finra.complinet.com/en/display/display.html?rbid=2403&element_id=11539.
[10] Available at: http://finra.complinet.com/en/display/display_main.html?rbid=2403&element_id=11764.
[11] Klastech generally disregards, without explanation, the provision of the purchase agreement requiring PTI to also pay the greater of €300,000 (minus debt payments) or a percentage of Klastech's future sales. *See* Purchase Agreement §§ 1.2, 1.4. GT's Reply notes Klastech's omission, but neither party makes any serious attempt to quantify the value of that provision.

"FINRA is a self-regulatory organization that has 'the authority to exercise comprehensive oversight over 'all securities firms that do business with the public.''" *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 737 (9th Cir. 2014) (quoting *UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 648 (2d Cir. 2011)). The parties have not addressed whether FINRA rules can be considered "United States federal [or] state . . . securities laws [or] regulations." *See* Engagement Letter at 9, § 11. Given that "FINRA Rules must be interpreted in accordance with principles of contract interpretation," there is some authority for treating such rules as a separate private agreement rather than as laws or regulations. *See UBS Fin. Servs.*, 660 F.3d at 649 (summarizing *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 176 (2d Cir. 2003)). Nevertheless, because neither party disputes the proposition that FINRA rules generally fall within the scope of the engagement letter's "Compliance with Securities Laws" provision, the Court assumes for the sake of argument that the engagement letter binds GT to those rules.

The Court is not persuaded, however, that either Rule 2121 or the five percent mark-up policy has any bearing on this case. Rule 2121 governs transactions in which a securities broker "buys for his own account from his customer, or sells for his own account to his customer." FINRA Rule 2121. The transaction at issue here does not meet that description. GT did not buy or sell any securities for its own account; it advised and assisted Klastech in selling securities (here, stock constituting the entirety of Klastech) to a third party, PTI, after helping Klastech market itself to other potential acquirors over a period of multiple years. *See* Tabibian Decl. ¶¶ 17−18. In addition to falling outside of the plain language of the rule, this sort of transaction does not raise the same self-dealing concerns inherent in transactions where the broker buys or sells on its own account.

Rule 2122 is broader, encompassing "[c]harges, if any, for services performed, including, but not limited to, miscellaneous services such as collection of monies due for principal, dividends, or interest; exchange or transfer of securities; appraisals, safe-keeping or custody of securities, and other services." FINRA Rule 2122. If either rule applies here,[12] it is this one. Rule

---

[12] Klastech cites no authority that either rule applies to the kind of transaction. *See* Opp'n at 6−8. GT argues that "Rule 2122, while referring to 'services' generally, is plainly directed at routine

2122, however, makes no reference to the five percent guideline found in the supplemental materials to Rule 2121, and Klastech cites no authority suggesting that guideline applies to this rule. Without that guideline, Rule 2122 requires only that charges "shall be reasonable and not unfairly discriminatory among customers." *Id.*

There is no suggestion that the success fee provision was "unfairly discriminatory," and Klastech provides no evidence or authority indicating that a $400,000 minimum success fee is unreasonable or uncommon for the sort of advisory and marketing services at issue here. As justification for the provision, GT offers Tabibian's declaration that "GTK insisted on a minimum payment because (1) the Engagement would require substantial effort by GTK—i.e., hundreds of hours; and (2) the value of Klastech was uncertain." Tabibian Decl. ¶ 9. In other words, the engagement carried risk that Klastech might not fetch a large purchase price, and the agreement was structured so that Klastech, rather than GT, would bear the risk.

As a general principle, courts defer to freely negotiated contract provisions that are "the product of an arms-length transaction between sophisticated businessmen, ably represented by counsel." *See JMD Holding Corp. v. Congress Fin. Corp.*, 4 N.Y.3d 373, 382 (2005) (citation omitted) (addressing enforcement of liquidated damages provisions); *see also NRG Power Mktg., LLC v. Maine Public Utils. Comm'n*, 558 U.S. 693, 699 (2010) (discussing the well-established "*Mobile-Sierra* presumption . . . that contract rates freely negotiated between sophisticated parties meet the just and reasonable standard imposed by [statute]" in the context of utilities regulation); *Ashwood Capital*, 948 N.Y.S.2d at 297 ("We apply this rule [of enforcing contracts as written] with even greater force in commercial contracts negotiated at arm's length by sophisticated, counseled businesspeople.").

Here, in negotiating the engagement letter, Klastech was represented by two board members who were also principals of the venture capital firm that was its majority owner, as well as outside counsel from a major international law firm. Tabibian Decl. ¶¶ 6−8. Klastech also

---

share purchases or sales or administrative tasks," but likewise cites no authority in support of that view. *See* Mot. at 14; *see also* Reply at 7. The Court assumes for the sake of argument that Rule 2122 applies.

separately reaffirmed the terms of the engagement letter by executing a letter agreement in 2012, declining to exercise GT's offer to allow Klastech to terminate the agreement with no further obligation. *Id.* ¶ 15 & Ex. E ("The Success Fee paragraph applies to, but is not limited to, current potential acquirors Newport and Zygo."). A strong presumption of reasonableness therefore applies.

Klastech asks the Court to set aside the unambiguous product of these negotiations based on a general reference in the engagement letter to compliance with the law, an industry regulation setting forth a broad standard of reasonableness, and the fact that Klastech ultimately did not fetch the sort of up-front purchase price that the parties had hoped it would years before. Klastech presents no evidence that the success fee was unreasonable at the time it was negotiated. The Court holds that an unfavorable result of an uncertain transaction, after one sophisticated party to the transaction agreed to bear the risk, is not in itself sufficient to create an issue of material fact as to the agreement's reasonableness. On the record before the Court, summary judgment for GT is therefore appropriate.

### F. GT Is Entitled to Recover $554,000

Having concluded that the success fee provision is applicable and enforceable, the Court finds that Klastech owes GT $400,000 under the terms of that provision. *See* Engagement Letter at 3, § 2(b)(i) ("[T]he M&A Success Fee shall at a minimum be $400,000 in the event a Transaction is consummated.").

GT also seeks $154,000 in interest pursuant to section 14 of the engagement letter, which provides that "[e]arned amounts that remain due . . . will accrue interest from the delivery date of the invoice for such due and unpaid amounts until GTK received payment at a rate of 1.75% per month or the highest legally allowed rate, whichever is lower." Engagement Letter at 9, § 14. The engagement letter also provides that "[i]nvoices for the reimbursement of expenses shall allow 15 business days for payment." *Id.* GT invoiced Klastech for the $400,000 success fee on June 12, 2013. Tabibian Decl. ¶ 19 & Ex. G. Although the invoice also included an "Interest Charge through June 12, 2013," GT's present motion only seeks interest accrued starting fifteen business days after that date, which is July 3, 2013. *See id.* Ex. G; Mot. at 9 & n.6.

1   Klastech does not dispute GT's interest calculation or argue that the "highest legally
2   allowed rate" is less than 1.75% per month. *See generally* Opp'n. At 1.75% of $400,000, interest
3   accrues each month in the amount of $7,000. Twenty-two full months have elapsed between July
4   3, 2015 and the date of this Order. GT is therefore entitled to $154,000 in interest, for a total
5   recovery of $554,000.

## IV.   CONCLUSION

For the reasons stated above, GT's Motion for Summary Judgment on its claim against Klastech is GRANTED. Although GT has requested that judgment be entered against Klastech, *see* Mot. at 15, GT's claim against Triangle is not yet resolved and GT has made no showing that the Court should enter separate judgments because "there is no just reason for delay," *see* Fed. R. Civ. P. 54(b). If GT believes that a separate judgment against Klastech is warranted, GT may bring an application for judgment setting forth the reasons for such belief. The stipulated scheduling order adopted by the Court on March 12, 2015 remains in effect as to GT's remaining claim against Triangle.

**IT IS SO ORDERED.**

Dated: May 15, 2015

JOSEPH C. SPERO
Chief Magistrate Judge